**UNITED STATES of America,**
Plaintiff,

v.

**UTAH PHARMACEUTICAL ASSOCIA-**
**TION, Defendant.**

**No. C 30–61.**

United States District Court
D. Utah,
Central Division.

Jan. 3, 1962.

**30**

Lyle L. Jones, Don H. Banks, Gilbert Pavlovsky, San Francisco, Cal., and William T. Thurman, U. S. Atty., for the District of Utah, Salt Lake City, Utah, for plaintiff.

Arthur B. Hanson (Hanson, Hanson & Cobb, Washington, D. C.), and Charles Welch, Jr., Salt Lake City, Utah, for defendant.

CHRISTENSEN, District Judge.

The United States of America, as plaintiff, seeks an adjudication that the defendant, Utah Pharmaceutical Association, has engaged in activities which have violated Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, and enjoining by decree of court the continuation of these activities.

The defendant is a nonprofit corporation, organized under the laws of the State of Utah, with its principal place of business at Salt Lake City. Its membership until 1959 was comprised largely of drugstore owners and managers, but in that year it limited its active members to registered pharmacists. At the end of 1960 a majority of the pharmacies of the State were represented in the Association by either their owners or their managers.

Plaintiff charges that a conspiracy was entered into among the Association and its officers, directors and members, to fix and control the prices of prescription drugs for retail sale, through the establishment, adoption, distribution and promotion of a pricing schedule which had the effect of fixing prices. Defendant denies that there was any such unlawful conspiracy and further denies that interstate commerce was affected by any pricing schedule or that there was an unreasonable restraint of trade or commerce, as distinguished from a reasonable exchange of information among pharmacists as members of a learned profession.

Through pre-trial proceedings, with the cooperative diligence of able counsel, most of the facts of the case have been stipulated. Consequently, the actual trial of the case required less than a day. Attention, therefore, may be focused mainly upon the important legal principles involved, although there must be some

findings of ultimate fact made by the Court upon the basis of inferences to be drawn from the stipulated facts, the documents received in evidence and brief testimony and a deposition received in open court.

Upon the threshold of decision, I am confronted by certain objections reserved by the respective parties to certain stipulated facts and documents, based mainly upon the ground of their alleged immateriality or irrelevancy, and, in some instances, on the claim of incompetency or hearsay. To facilitate the trial and to permit the Court to consider these problems upon final submission, as against the background of all of the evidence, counsel agreed that the ruling of the Court could be reserved, for consideration upon final submission.

In general the objections which the plaintiff urges are to matters of which the Court could take judicial notice anyway. In a case before the jury they might involve needless irrelevancy, but for the most part constitute background circumstances concerning the profession of pharmacy and other professions and activities which could in some aspects assist, and would in no instance preclude, a proper resolution of the issues before the Court sitting without a jury. Accordingly the plaintiff's objections are overruled.

I see no merit to the defendant's objections to paragraphs 3, 22, 25, 26 and 27 of section I of the pre-trial stipulation, nor to paragraphs 19, 21, and 23, section IV. The defendant's general objection to paragraphs V and VI also are overruled. Facts concerning the organization of local associations under the sponsorship or with the cooperation of the defendant and statements appearing in The Utah Pharmaceutical Association Bulletin News, the official publication of the defendant, are deemed admissible to the extent offered for such light as they may throw on the issues before the Court. The objection to paragraphs 7, 8 and 9 of section I, is overruled, since what happens to drugs before they reach a Utah pharmacy was relevant to plaintiff's theory of the case with reference to the element of interstate commerce. Defendant's objections to section II of the stipulation also are overruled.

I entertain doubts as to the admissibility of exhibits 53, 53a and 53b, in view of the hearsay nature of detailed answers from various persons throughout the State, and therefor sustain the defendant's objection thereto. With respect to the other exhibits to which objection is made by the defendant, they are received for such light, if any, that they may throw upon the question of a conspiracy. Most of them are extracts from the official publication of the defendant Association distributed among its officers and directors and to its members. At least they constitute information coming to the attention of the Association, or its own representations and claims, which presumably also come to the attention of its officers, directors and members. In some instances they may be considered admissions, and in others they come within the doctrine of Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917). When persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful (such association being established by independent evidence), from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, may be considered the act of all and admissible as primary and original evidence.

We do not reach, upon the question of admissibility, the full force of the latter doctrine since the evidence coming from the official publication of the Association is not introduced to connect any other particular party to the conspiracy or to hold other parties responsible for the declarations of the Association. To the extent, however, that the evidence establishes declarations of local Associations, I have deemed most of these sufficiently

connected up on the question of the use of the price schedule with the activities and objectives of the defendant Association to be admissible against it. However, this has not been a determinative factor; my findings would have to be the same even though I should entirely disregard any declarations or activities of local associations as shown by the evidence.

Passing now to the merits, the four determinative questions in the case are:

I. Is the restraint alleged in the complaint, to the extent supported by the evidence, one which is in restraint of trade or commerce *among the several states* within the purview of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1?[1]

II. Does the fact that a pharmacist in filling a drug prescription is engaged in the practice of a learned profession immunize the defendant from the reach of the Act?

III. Has the defendant, with its officers, agents and members, or some of them, conspired to fix charges for the dispensing of prescription drugs within the prohibitions of the Act?

IV. Is such conspiracy, if any, a per se violation of the act, or does it constitute a reasonable restraint of trade acceptable under the anti-trust laws?

### I

The government relies upon two legal theories to sustain its jurisdictional position that interstate commerce is involved: (1) That the alleged conspiracy impinged upon goods or services in the flow of interstate commerce and, (2) that the unlawful activities of the Association substantially affected interstate commerce, citing Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); United States v. General Motors Corporation, 121 F.2d 376 (7 Cir.1941), motion to withhold the order denying petition for cert. gran-

ted 314 U.S. 579, 62 S.Ct. 124, 86 L.Ed. 469, cert. den. 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, reh. den. 314 U.S. 710, 62 S.Ct. 178, 86 L.Ed. 566; Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9 Cir.1954), cert. den. 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645, reh. den. 348 U.S. 889, 75 S.Ct. 202, 99 L.Ed. 698; Plymouth Dealers' Ass'n of Northern California v. United States, 279 F.2d 128 (9 Cir.1960), and United States v. Northern California Pharmaceutical Association (N.D.Cal.1961) (unpublished). In the latter case the late Judge Goodman took the view in his instructions to the jury that evidence similar to the evidence before me was clearly sufficient to show that the drugs were in the flow of interstate commerce when sold to the public at retail.

United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948) is relied upon by the Association to demonstrate that while the power of Congress over interstate commerce may extend to drugs received from interstate commerce and held for intrastate retail sale, only by the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq., and not in the anti-trust laws, has Congress chosen to exercise the full sweep of its powers. Sullivan does, indeed, establish the broad scope of the congressional power; but the limitations with reference to the anti-trust laws sought to be drawn from this decision were expressly rejected in United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945), which held that, with regard to commercial trade restraints, Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied. I do not read Eli Lilly & Co. v. Sav-On-Drugs, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961) reh. den. 366 U.S. 978, 81 S.Ct. 1913, 6 L.Ed.2d 1268, and the other cases cited by the defendant as militating against the reach of the anti-trust act under the

---

1. "Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among

the several States, * * * is declared to be illegal * * *."

facts of the present case, because either different legal questions, or significantly different factual situations, were there involved. Nor do I think that the statutes of the State of Utah which regulate the practice of pharmacy set up an effective "barrier" to the application of the Sherman Act in this case, as suggested by the defendant.

█ Approximately ninety percent of the prescriptions dispensed by pharmacists in the State of Utah during the period covered by the complaint consisted of drugs which were sold without additional pharmaceutical manipulation by the pharmacist. An article which appeared in the Utah Pharmaceutical Association Bulletin News in July 1956 represented that of over sixteen thousand new prescriptions which were analyzed and which were filled during the calendar year 1955, only four percent required compounding. Most of the drugs used to fill prescriptions in the State of Utah are manufactured outside the State and are shipped from the place of manufacture either to wholesale drug firms located in the State of Utah or directly to pharmacists within the State.

The most common purchase of drugs by pharmacists is in quantities of 25, 50, 100, 500, and 1000, and is received by the pharmacists in the original package or container of the manufacturer. After the pharmacist calculates the price of the prescription, he is required by the State to collect a sales tax which is applied to the total price charged for the prescription. The pharmacist, in a sense, acts as a conduit and delivers the drugs from their actual interstate movement to the consumer. Indeed, as a practical matter, with respect to the type of drugs requiring prescriptions, he is the sole conduit from sources outside the State of Utah to the consumer. The dollar value of prescription drugs dispensed to consumers in Utah by members of the defendant Association was substantial during the period covered by the complaint.

It is concluded that the questioned activities of the Association affected interstate commerce and that the goods involved were in the flow of interstate commerce at the time with which we are concerned.

## II

█ The fact that a pharmacist in filling a prescription is engaged in the practice of a learned profession does not immunize the defendant from the application of Section 1 of the Sherman Act.

█ Defendant seeks to state this issue in the form of two mutually exclusive alternatives: Is the dispensing of prescriptions the practice of a learned profession, or is it the retail sale of a commodity in commerce? But the mere circumstance that goods in commerce are treated or handled by, or otherwise connected with, a learned profession does not remove the goods themselves, nor transactions affecting them, from the applicability of the Sherman Act. This is made plain by the decision of the Supreme Court in American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943); and the other cases cited by the defendant, Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); United States v. National Ass'n of Real Estate Bds., 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950), and United States v. Oregon State Medical Soc., 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952), do not throw this proposition into question. It is true that in the latter case the findings of the trial court that neither a conspiracy nor interstate commerce was shown on the facts was sustained by the Supreme Court, but this was upon the ground that the trial court's findings were not "clearly erroneous". In no way did that decision indicate that members of a learned profession were any more at liberty to restrain interstate trade in goods than any other class of persons. And in United States v. National Ass'n of Real Estate Bds. supra, the Supreme Court held that the antitrust act may reach unlawful conspiracies to restrain services as well as with respect to goods in interstate commerce.

We, however, are not here concerned with merely services, but with the drugs themselves. In view of this, the fact that fee schedules sponsored by associations of doctors and lawyers are not uncommon is of little persuasion, since their involvement with interstate commerce is questionable, and particularly because they relate entirely to professional services as distinguished from the pricing of goods or commodities. What the result would be if a fee schedule of doctors or lawyers covered the sale of commodities as a part and parcel of the medical or legal transaction for which the fee was fixed under the schedule is unnecessary to decide here. But it is clear that this would put a different complexion upon the related activities of an association in that connection.

There might be some legitimate argument whether the use of the schedule for the pricing of prescription drugs was reasonable if the schedules primarily dealt with matters other than the price of drugs, or if their major concern or effect was with reference to services rather than drugs. It, however, is apparent that the factor of services in going to make up the schedule is considerably less determinative than wholesale drug prices. Nor does the schedule purport to regulate the compensation of pharmacists employed by a drugstore, but only the gross return of the store for the dispensing of the drugs. There could be many better means for dealing primarily with the price or cost of the services of a professional pharmacist without involving an agreement for the uniform pricing of the drugs themselves. As shown by the evidence the process of determining the prices of drugs, pursuant to the schedule with which we are concerned, involves merely the ascertainment of the wholesale cost per one hundred of the item in question, and, upon the basis of this, a reading from the schedule of the retail price of the particular prescription drug.

If, by commingling service factors with other bases of price control, agreements to fix prices could be legalized, there are few businesses that could not incorporate by some means a professional or other service factor in their pricing schedules and thus insulate their otherwise illegal agreements from the reach of the anti-trust laws.

III

Direct and independent evidence of an established purpose, policy and project of the defendant Association, and stipulated facts and exhibits that are clearly admissible as acts and declarations in furtherance of the objectives of the Association, leave no room for doubt that the officers and directors, with the intent of establishing uniform prices for prescription drugs within the State of Utah to the extent of their ability, adopted a pricing schedule and successive revisions, distributed them to members throughout the State and urged and induced the members to use the schedule for the pricing of prescription drugs. It also is fairly to be inferred, from a preponderance of the evidence, that officers of the Association among themselves agreed to foster and promote the schedules as a part of the Association activity and to utilize such schedules in the carrying on of their own businesses.

The fact that some, or all, of the members had access to and, to an extent, from time to time may have used, pricing schedules other than those adopted and distributed by the Association does not militate against the conspiracy nor the intent of the Association to promote the use of its schedule to stabilize prices on that particular basis. And the preponderance of the evidence indicates that the Association schedule was the most effective one for establishing uniformity of prices to the degree which has been achieved. The Association in its Bulletin from time to time expressed gratitude "for the opportunity to comment on the schedule and to urge its use by the pharmacists of the State." It was said that "adopting it really paid off." It was suggested "that through your organization every pharmacist accept the pricing schedule and adhere to it." It

was remarked that "the boys are using it." If we discount these and similar statements as partly promotional rather than factual in nature, yet the agreement and intent remain, it is undeniable that the activities of the Association have had some substantial effect, if that were necessary, in encouraging and promoting uniformity of drug prices within the State.

Plymouth Dealers' Ass'n of Northern California v. United States, supra, 279 F.2d 128 (9 Cir., 1960) held that the adoption, publication and distribution of the price schedule, with an intent to promote price uniformity, was a per se violation. This at least must be so, and it is enough to characterize the present case in view of its own facts without going to the extent of United States v. Nationwide Trailer Rental System, 156 F.Supp. 800, (D.C.Kan., 1957), aff'd. 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20, which indicates that with such adoption, publication and distribution shown, no proof would be necessary of an intent to fix prices or an agreement to adhere thereto.

IV

■ Having determined that the defendant was a party to a conspiracy to fix prices in restraint of commerce there remains for inquiry the issue whether such restraint was a reasonable or otherwise acceptable one under Section 1 of the Sherman Act. The defendant contends that if there were any agreement or understanding it would be an appropriate regulatory matter, long carried on and designed merely to regulate the practice of pharmacy in the public interest and not to fix charges, although resulting in identical charges at times. But no one by continued practice may acquire a vested right to violate the anti-trust laws; and, as we have already seen, one cannot lawfully agree with others to fix the price of goods in commerce merely because of professional credentials or because such price fixing also touches upon the matter of professional fees. The actual effect upon commerce of such price control is not ameliorated by either circumstance.

The defendant Association urges a "rule of reason" upon the basis of Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918); Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y. 1953), and United States v. Columbia Pictures Corporation, 189 F.Supp. 153 (S.D. N.Y.1960). These cases do not involve such agreements as this, the established intent of which manifestly was to bring about a uniformity of prices in direct restraint of the competitive trade which the Sherman Act was designed to protect. If there is a per se violation of the act, there would seem to be no "rule of reason" which would excuse it. Here the per se nature of the violation to preclude the argument of reasonableness is established by the principles of United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), reh. den. 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421, and United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1947).

■ However, were we authorized to look beyond the per se nature of the violation to the reasonableness of the restraint, we would still be confronted by an unsupportable system. There could not be considered reasonable under any circumstances a conspiratorial agreement, and the distribution and promotion of implementing price schedules, among those in a dominant position in the business and profession of dispensing drugs within the State of Utah, which carried to the extent sought by the Association would almost completely remove price competition in the field of prescription drugs. The good faith and professional standing of those concerned being fully accepted, if such a system were accepted as reasonable, any other similar group of well intentioned men could accomplish the same results in their own businesses through their own associations. This result, with any effective agreement to that end, is unacceptable to the anti-trust laws. It is the duty of a Court

to apply these laws in easy cases as well as hard cases, and as against well intentioned parties to an agreement conspiratorial only in law as well as against conspirators in sinister sense which, of course, cannot apply to the parties before the Court. Even under the "rule of reason," as said in Board of Trade of City of Chicago v. United States, supra, "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." The system promoted by the Association does not meet this test, but on the contrary constitutes such a per se violation as to render the test inapplicable.

I conclude that the principles of the cases cited are controlling upon me in the case at bar. There appears to be no process of rationalization, nor no exception or refinement which would sustain the price fixing activities of the Association without being destructive of the foundations of Section 1 of the Sherman Act as confirmed by the decisions of the Supreme Court of the United States. What would be the status of "professional service schedules" as distinguished from "drug pricing schedules" it is unnecessary to determine here. Fully recognizing the professional capacity and services of pharmacists, the conclusion seems inescapable that the schedules in question did not have as their sole or even primary purpose the regulation or stabilization of fees or compensation of members of a learned profession, and, if they did, the pricing of drugs as a commodity was so intermingled and confounded as to invalidate the whole.

The plaintiff is entitled to an adjudication that the pricing activities of the Association as specified above are in contravention of Section 1 of the Sherman Act, and enjoining the continuation of such activities as prayed for in the complaint.

I hereby adopt as my findings of fact the pretrial stipulations of the parties as qualified and supplemented by the rulings, deductions, inferences and conclusions stated in the foregoing decision, all of which are deemed to be sufficient for the purposes of Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A.

The counsel for the plaintiff are directed within a period of ten days to prepare a proposed decree consistent herewith for service upon opposing counsel and lodging with the Court, to be settled upon notice.