**NORTHERN CALIFORNIA PHARMACEUTICAL ASSOCIATION, a Corporation, and Donald K. Hedgpeth, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 17549.**

United States Court of Appeals Ninth Circuit.

June 27, 1962.

Certiorari Denied Oct. 15, 1962.

See 83 S.Ct. 119.

Hanson, Hanson & Cobb, Arthur B. Hanson, Washington, D. C., Broad, Busterud & Khourie, John W. Broad, Michael N. Khourie, San Francisco, Cal., and R. K. Kennon Jones, Washington, D. C., of counsel, for appellants.

Lee Loevinger, Asst. Atty. Gen., Dept. of Justice, Anti-Trust Division, Lyle L. Jones, San Francisco, Cal., Richard A. Solomon, Washington, D. C., Don H. Banks, Gilbert Pavlovsky, San Francisco, Cal., Patrick M. Ryan, attys., Washington, D. C., and Cecil H. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before ORR, HAMLEY and MERRILL, Circuit Judges.

ORR, Circuit Judge.

Appellants stand convicted of violation of § 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1 et seq. The indictment charges a combination and conspiracy in restraint of trade and commerce among the several states during the period 1956–1960, consisting of "a continuing agreement, understanding and concert of action among the defendants, co-conspirators, and others to the grand jurors unknown, the substantial terms of which have been and are that they agree:

"(a) To establish and maintain uniform prices for prescription drugs sold to consumers in northern California; [and]

"(b) To adopt the prescription pricing schedule formulated by [appellant] Hedgpeth * * *."

Northern California Pharmaceutical Association (hereinafter the "Association") is an incorporated California trade association with headquarters at San Francisco. It has more than 1500 retail pharmacist members, of whom almost three-fourths own and operate their own

pharmacies. An annually elected executive board composed of officers and directors is responsible for the conduct of Association affairs. Among other corporate purposes, the Association is "[t]o provide means whereby retail druggists by united or concerted action can and may do such things as will tend to promote * * * their mutual and common interests."

Donald K. Hedgpeth is the owner and operator of West Coast Drug Company, a San Francisco pharmacy. From 1956 to 1960 he served as chairman of the "Suggested Prescription Pricing Schedule Committee" (hereinafter the "Pricing Committee"), organized by the Association's executive board. During this period he formulated and presented to the Committee for its consideration and action a "Suggested Prescription Schedule for Non-Compounded Prescriptions" (hereinafter the "Hedgpeth Schedule").

■ The appeals before us present numerous grounds. We consider them in order.[1]

## I. The Charges Against Appellant Hedgpeth.

■ Starting with a challenge to the sufficiency of the indictment and building from there, we proceed. It is argued for the first time in appellants' closing brief and was not assigned in appellants' specification of errors that the charges against Hedgpeth are based upon activities carried on by him solely in a representative capacity as an official of the Association. It is said that action taken in such a capacity can be reached only by indictment under § 14 of the Clayton Act, 15 U.S.C.A. § 24. Several District Court cases, some of which are now before the

Supreme Court for review, are cited in support of this proposition.[2] We note that in said cases it appears beyond doubt from a reading of either the indictment, a bill of particulars, or a stipulation, that the moving defendants were in fact charged "solely in a representative capacity." In the instant case the indictment, stipulation, and proof reveal that the charges against Hedgpeth are based on acts performed in most part in an individual capacity with few exceptions of a dual capacity. He is described in the indictment as an independent pharmacist, as a past president of the Association, and as chairman of the latter's pricing committee. The stipulation describes him solely as an independent pharmacist. The proof shows that he offered to and in fact did himself formulate and from time to time revise the "Hedgpeth Schedule", proceeding in part at least on formulae which he had personally devised years before. It also appears that he used this pricing schedule in his own pharmacy. The mere fact that Hedgpeth is also described in the indictment as an official of the Association "does not mean that [his] conduct as such [official] is complained of, but rather [he is] charged as [an individual] together with the [Association] with violations of the Sherman Anti-Trust Act." United States v. General Motors Corp., 26 F. Supp. 353 (N.D.Ind.1939), affirmed 121 F.2d 376 (7th Cir. 1941), cert. denied, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1942).[3]

## II. Appellants' Motion for Change of Venue.

■ Appellants were indicted and arraigned in the latter half of December,

---

1. The facts are of course viewed in the light most favorable to the Government, which had judgment below. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941) and Cellino v. United States, 276 F.2d 941 (9th Cir. 1960).

2. See, e. g., United States v. National Dairy Products Corp., 196 F.Supp. 155 (W.D.Mo.1961), prob. juris. noted, sub. nom. United States v. Wise, 368 U.S. 945,

82 S.Ct. 387, 7 L.Ed.2d 342 (1962). But see contra, United States v. American Van Lines, 1962 Trade Cases, para. 70,213 (D.D.C.), and United States v. Packard Bell Elec. Corp., (S.D.Cal., 1962).

3. Accord: United States v. Atlantic Commission Co., 45 F.Supp. 187, 194 (E.D. N.C.1942). See also, United States v. Winslow, 195 F. 578, 581–582 (D.Mass. 1912).

1960. In late January, 1961, they entered pleas of not guilty. In mid-March they presented two motions for a continuance, the second of which ultimately resulted in a postponement of the trial date until almost the beginning of June. On March 24th, appellants moved under F.R.Cr.P., rule 21(a), 18 U.S.C.A. for a change of venue. The purported grounds for the motion were great community bias and prejudice alleged to have been caused by newspaper reports of certain remarks made by the judge who heard and granted the second motion for a continuance. During the course of that hearing, the judge in giving reasons against any further delay in going to trial said:

"If the charges or the allegations made by the Government in this indictment are true, it means that *every person who has ever paid for a prescription drug* during the period which is within the statute of limitations has a treble-damage anti-trust action."

These remarks, accompanied by innocuous commentary, were carried by four Bay Area newspapers in editions which appeared immediately after the hearing. The articles were not remotely inflammatory and one undertook to challenge the court's views on the question of private suits. Apparently appellants' contention is that some readers of said reports would conceive the idea that it would redound to their interest if appellants were convicted. No abuse of discretion on the part of the trial court in denying the motion appears. See Callanan v. United States, 223 F.2d 171 (8th Cir.), cert. denied, 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764 (1955).

The mere general showing of publicity thought to be adverse to a party is not sufficient to require a change of venue except in the most extraordinary cases.[4] In the usual situation, the movant must at least make a showing that the allegedly prejudicial material reached the veniremen, so that a foundation is laid for the possibility of actual bias. Blumenfield v. United States, 284 F.2d 46 (8th Cir.), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961). Not only have appellants failed to show that any juror read, much less remembered these reports, the *voir dire* examinations of the jurors are not before us. The factors of, (a) the two and one-half month lapse from publication to trial,[5] (b) the routine nature of the reports,[6] (c) the size and general news inundation of the community,[7] (d) the precautionary instruction given on the subject by the trial court,[8] and (e) the trial court's finding of a resultant substantial burden on the parties and numerous witnesses if the motion were granted, amply sustain the denial of the motion.

III. *Professional Status as a Defense Under the Sherman Act in the Case of an Agreement to Fix Prices.*

Appellants claim for themselves an exemption from the Sherman Act by reason of their alleged status as "professionals." The gist of their argument is that the practice of pharmacy is a "learned profession," and that the activities with which the instant indictment charges them are merely reasonable regulations of various aspects of that "profession". Appellants' evidence tends to establish that in certain limited re-

---

4. Compare Finnegan v. United States, 204 F.2d 105 (8th Cir.), cert. denied, 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347 (1953); Shockley v. United States, 166 F.2d 704 (9th Cir.), cert. denied, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773 (1948), and Shushan v. United States, 117 F.2d 110, 133 A.L.R. 1040 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941), with Delaney v. United States, 199 F.2d 107 (1st Cir. 1952).

5. Compare Bianchi v. United States, 219 F.2d 182 (8th Cir.), cert. denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955).

6. See United States v. Bletterman, 279 F.2d 320 (2d Cir. 1960).

7. Compare Rakes v. United States, 169 F.2d 739 (4th Cir.), cert. denied, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948).

8. See Reynolds v. United States, 225 F.2d 123 (5th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801 (1955).

spects the practice of pharmacy, (as presently practiced at the local retail level,[9]) could be characterized at least as "quasi-professional." To understand why that fact is nevertheless utterly irrelevant in the *instant* case, it is necessary to review the nature of the present charges and the Government's establishment of a *prima facie* case of an agreement to fix prices in a commodity.

The indictment charges a classic case of an agreement to fix prices in a commodity, to wit, a prescription drug. Although dispensed by one who requires special training for some aspects of his occupation, the prescription drug no less than the law book, the text on bacteriology, or the handbook on accounting, is an article of trade or commerce. Simply because the prescription drug is potentially dangerous if taken in the wrong amounts or by the wrong people and is therefore subject to close public regulation in many respects, does not change the character of the drug or put every action of its handlers beyond the reach of the Sherman Act. Compare Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 404, 31 S.Ct. 376, 55 L.Ed. 502 (1911). It is evident that what is involved here is a plain and simple agreement to fix prices, as will more fully appear, infra, under our discussion of the sufficiency of the evidence of an agreement. We deem it advisable at this point to sketch the Government's basic proof regarding the make-up of the price of a prescription drug.

■ The charges and proof center around the handling and pricing of what is defined in the indictment as a "precompounded prescription drug." This is a drug which passes from the manufacturer through the hands of the local pharmacist without undergoing further compounding or basic change in form. It is established that these drugs are handled by manufacturer, warehouseman and wholesaler in much the same way as

is any other commodity. Final distribution of such a drug by the retailer involves the receipt of a prescription and an occasional re-labelling of the drug and a breakdown in quantity. The hired pharmacists who do this work are unionized and are on straight-time wages.

That it is first and foremost a "price" in the classic sense which is involved in appellants' schedule appears from the testimony of several of appellants' witnesses:

*The Defendant Hedgpeth:*

"Q. And the pharmacist who fills the prescription gets a wage, doesn't he?

"A. That is right.

"Q. This is what you're negotiating about all the time?

"A. Yes.

"Q. And I believe you testified that when wages go up the schedule went up; is that right?

"A. That is correct, yes sir."

\* \* \* \* \* \*

"The Court: That [price] is the amount that is paid to the owner of the store, isn't it?

"The Witness: Yes, sir.

"The Court: So the man, the pharmacist, the licentiate, he doesn't get any more or any less, according to this schedule, than the wages he is paid by the storeowner, unless, of course, he owns the business or has an interest in the business.

"The Witness: I couldn't answer that for all stores, sir. I know in my store it is a wage."

*Ward Falor:*

"Q. And when you say you use a schedule, what do you mean by the use of a schedule?

"A. Well, you have got to ascertain within some rough figure what the price of the prescription is going to have to be in order to come out on

---

9. The record shows that the practice of pharmacy has, with many other special skills in our society, progressively succumbed to the demands of mass production and mass merchandising in the industry which it serves.

it. You have got your pharmacist to pay, your overhead, and all your other little incidentals that happen to come in there, and you have either got to set a figure on that or charge a flat professional fee and give the medicine to the customer for nothing."

*Morris Boynoff:*

"Q. * * * what is your formula for pricing?

"A. Well, my formula is essentially predicated on return of the ingredients cost plus a fee for my services."

In short, it is in an area of "entrepreneurial," rather than professional activity, that appellants are charged with having run afoul of the Sherman Act. Compare United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 463–464, 69 S.Ct. 714, 93 L.Ed. 805 (1949). To a *prima facie* case of an agreement to fix prices in a commodity, very limited defenses are open to appellants.

■ Much authority exists demonstrating that reasonableness is no defense to a case of price-fixing. See, e. g., Northern Pacific R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Rather, appellants may attempt to show only that what is proven is in fact *not a price-fixing agreement,* but rather is: (a) a narrowly defined and reasonable regulation of a subject such as the hours of trading,[10] (b) a reasonable reform of *non-price* industry practices generally,[11] or (c) a regulation of trade, commerce or a profession required,

or specifically authorized and controlled, *by law.*[12] In short, there is no defense to *price-fixing* on the ground that it is reasonable or that it is being done by professionals. Appellants' "professional" status *per se* will not protect them if the activity in which they are shown to have engaged is clearly proscribed by the statute. American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943).

■ The evidence and instructions offered by appellants as a defense to the *prima facie* case of price-fixing were properly rejected as irrelevant to any of the possible defenses just outlined. A very great volume of this evidence was historical, attempting to show the rise and development of the practice of pharmacy,[13] the history of its pricing practices, and the conditions in the trade purportedly requiring orderly central supervision of the pricing structure. None, however, was probative on the question of whether the specific activity proved by the Government was or was not an agreement to fix the price of a commodity.

■ Appellants' attempt to show the need for supervision of the pharmaceutical price structure might on the contrary make a case for the regulation of drug prices *by law.* But here, as in the closely analogous case of United States v. Erie County Malt Beverage Distributors Ass'n, 264 F.2d 731, 733 (3d Cir. 1959), there is no showing that existing legislation in the field authorizes price fixing in any form. And far from suggesting that public regulation be instituted, appellants suggest that they should be per-

10. Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918).

11. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L. Ed. 825 (1933).

12. See Semler v. Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); Graves v. Minnesota, 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331 (1926). See also, American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F.2d

233, 244–245 (1942), affirmed, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943).

13. Some of the excluded evidence, going back to Eighth Century Persia, and including edicts on the practice of pharmacy issued in 1240 by no less a figure than the Holy Roman Emperor, Frederick II, were, needless to say, outside the relevant period covered by the indictment and were properly excluded, in Mr. Justice Holmes' phrase, as "a concession to the shortness of life." See Reeve v. Dennett, 145 Mass. 23, 28, 11 N.E. 938, 944 (1887).

mitted to carry on that regulation with no public overseer. It is precisely such use of uncontrolled private economic and quasi-political power in the market place which the Sherman Act condemns. Such regulatory power, if it is to exist at all, resides under our system in democratically controlled legislatures. The Sherman Act forbids appellants to appropriate a segment of that sovereign power to their private association. American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233, 244–245 (1942), affirmed, 317 U.S. 519, 63 S.Ct. 326, 87 L. Ed. 43 (1943).

We do not decide that every action of professionals is within the reach of the Sherman Act. We do decide that an agreement among professionals to fix a commodity price is.

## IV. *Restraint on the Flow of Interstate Commerce.*

Admitting that the precompounded prescription drugs which are the subject of the present charges start out in the flow of interstate commerce, appellants argue that later events in the vending of the drugs cause them to be withdrawn from that flow before they reach the ultimate consumer. In considering this contention, we review the relevant facts, stipulations and concessions of the parties.

It is stipulated that of all sales during 1959 of prescription legend drugs by fifteen leading drug manufacturers whose places of manufacture are outside the State of California, more than one-fourth, or over $8 million worth of those made in northern California were made by direct shipment to pharmacies which are members of the appellant association. The testimony detailing the over-all pattern of trade in the drug industry is even more instructive. "Detail men," or local sales representatives of the out-of-state manufacturers are constantly at work in northern California acquainting physicians and pharmacists with new drugs, stimulating interest generally in the firm's products, and urging physicians to prescribe, and pharmacists to order, the

manufacturer's goods. One manufacturer, Eli Lilly, even guarantees the ultimate retail sale of its trade-marked products. Another, Abbott Labs, predominates in sales direct to pharmacies without the use of any intermediary. Abbott's marketing surveys show that every year during the relevant period of the indictment more than 90% of the prescriptions sold in northern California were dispensed by pharmacists as manufactured, without any significant change in form. It was shown that from Winthrop Labs some goods were "shipped automatically to the retail pharmacist without him placing an order" with the Labs.

In the case of wholesalers who receive the bulk of their stock of the relevant products from out-of-state, it is shown that their inventory and sales policies are based on anticipated orders from pharmacies, that they have "direct order" phone lines to specific local pharmacists who are their regular customers, and that the flow of goods through their firms is kept at a steady level by the use of "automatic" IBM card inventorying. The retailer, when he receives the drugs, in many cases merely passes on the original package in response to a prescription, re-labelling the package, because to do so "is very good advertising." On some of the packages the manufacturer has placed an easily removable label for this very purpose.

Faced with this pattern of business, appellants in their brief concede that "[a] substantial portion of these drugs came direct to the pharmacies from manufacturers outside the State of California and these drugs are in the 'flow' of commerce certainly up to the point that they reach the pharmacies' storage shelves."

The narrow question with which we are then left is whether as a practical matter, the "flow" must be said as a matter of law to stop before the drugs reach the consumer. Under tests laid down by the United States Supreme Court and on the authority of other closely analogous

cases, the answer to that question must be in the negative, at least with respect to the substantial amount of prescription drugs which reach individual pharmacies by direct shipment from out of state.

Although the question thus posed is a narrow one, we are called upon in this Sherman Act case to take the broad view of the business practices disclosed in this record. We are cautioned that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518 (1905); Plymouth Dealers' Ass'n v. United States, 279 F.2d 128, 135 (9th Cir. 1960). We look to see whether from the evidence the jury could reasonable conclude that there was a "practical continuity of movement" of the drugs to the point where the restraint was to be applied. United States v. Chrysler Corp., 180 F.2d 557, 559–560 (9th Cir. 1950). We attempt to determine, not by tracing the erratic movements of a single prescription drug, but by observing the usual course of the whole trade, what ultimate disposition of the product is contemplated by the business people involved. Pevely Dairy Co. v. United States, 178 F.2d 363, 366 (8th Cir.) cert. denied, 339 U.S. 942, 70 S.Ct. 794, 94 L. Ed. 1358 (1950). It is evident from the record that the jury would be justified in concluding, at least with regard to direct shipments to California pharmacists from out-of-state sources, that the undivided attention of manufacturer, warehouseman, wholesaler and retailer is upon the ultimate consumer and his immediate aides, the physician and pharmacist, and that there is a "practical continuity of movement" here. See Las Vegas Merchant Plumbers' Ass'n v. United States, 210 F.2d 732 (9th Cir.); Pevely Dairy Co. v. United States, supra.

Nor does state regulation, requiring prescriptions and limiting the class of persons who can sell these drugs, operate significantly to interrupt the flow of commerce as a matter of law. Much the same kind of argument, based upon Pennsylvania's rigid control of the distribution of alcoholic beverages, was rejected in United States v. Erie County Malt Beverages Ass'n, 1957 Trade Cases, par. 68,590 at p. 72,376 (W.D.Pa.) affirmed, 264 F.2d 731 (3d Cir. 1959).

The concept of "interstate commerce" when confronted with an exercise of state power, as in Eli Lilly & Co. v. Sav-on-Drugs, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), relied on by appellants, is quite different from the concept which is relevant in cases such as the instant one. See Stafford v. Wallace, 258 U.S. 495, 525, 42 S.Ct. 397, 66 L.Ed. 735 (1922).

Appellants assign as error the exclusion of some evidence of the procedure of the pharmacist in preparing prescriptions and of his relationship to the physician, on the grounds that it would have tended to show a stoppage of the flow of commerce. Without expressing an opinion on its admissibility on this issue, we note that its exclusion was at most harmless error since in substance this same evidence was put in by the Government's witness Geiger, and the appellant's witnesses Yee and Falor.

Appellants also allege as error an expression of the opinion of the trial judge as to the existence of interstate commerce in the case.[14] Of course it is in the province of a federal trial judge to comment fairly on the evidence, so long as he leaves to the jury "the final decision and the power to disregard his remarks." Duke v. United States, 255 F.2d 721 (9th Cir.), cert. denied, 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1365

14. "In the opinion of the Court, and this is the only matter on which I express any opinion in this case, in the opinion of the Court the evidence is fully sufficient to show that the drugs were in the flow of interstate commerce when sold to the public and therefore that the Government has proved interstate commerce in this case. This, however, members of the jury, is only an opinion of the Court and you are not bound by it, and you are free to come to a different conclusion as you see fit."

(1958).[15] This is especially true where, as here, the issue is very nearly a mixed question of fact and law. Heinecke v. United States, 111 U.S.App.D.C. 98, 294 F.2d 727, 728–729, n. 4, cert. denied, 368 U.S. 901, 82 S.Ct. 173, 7 L.Ed.2d 96 (1961).

 Appellants' last objection in this area is aimed at that part of the instructions which would require the jury to make a finding of interstate commerce before conviction could be possible. They single out the instruction on agreement, which in effect stated that, "[i]f you find in this case * * * an agreement * * for the purpose of * * * fixing * * prices * * * you are justified in finding the defendants guilty." Appellants' contention before the trial court was that this instruction seemed to dispense altogether with the requirement of a finding of interstate commerce. Although he had in fact previously given an instruction on that point, the trial judge as a safeguard recalled the jury and stated in part, "[i]f you should find that there was not interstate commerce present in this case, then * * * your verdict would be an acquittal for the defendants." Appellants now contend that the instructions as originally given were faulty, that the attempted "cure" was unclear, and that in any event it was ineffective because it did not expressly withdraw the previous instruction. The instructions must be read as a whole, Barcott v. United States, 169 F.2d 929 (9th Cir.), cert. denied, 336 U.S. 912, 69 S.Ct. 602, 93 L.Ed. 1076 (1949),[16] and so read

might well be said to have been sufficient as originally given. Compare United States v. DeMarie, 226 F.2d 783 (7th Cir.), cert. denied, 350 U.S. 966, 76 S.Ct. 436, 100 L.Ed. 839 (1956). Contrary to appellants' claim, the earlier and later instructions were not "contradictory" or "inconsistent," so as to require a withdrawal of one,[17] and the "cure" was not at all unclear. Compare Seaboard Air Line R. Co. v. Bailey, 190 F.2d 812, 815 (5th Cir. 1951).

## V. *Evidence of an Agreement to Fix Prices.*

 The substance of the offense charged in this case, as set out earlier, is "a continuing agreement, understanding and concert of action among the defendants, co-conspirators, and others * * * to establish and maintain uniform prices for prescription drugs" by various enumerated means and devices. The co-conspirators are the Association as an active and independent legal entity, its officers, directors and committeemen insofar as they have carried on proscribed conduct, and those members of the Association who have knowingly, intentionally and actively participated in an individual capacity in the scheme which is said to result in the unlawful conspiracy.[18] Thus, to the limited extent that it carries on unlawful activity, the Association is itself a sort of continuing agreement by which the fixing of prices might be effectuated. This does not mean, however, that every member of the Association, by reason of his member-

15. Accord: United States v. Kravitz, 281 F.2d 581 (3d Cir. 1960). Compare, Quercia v. United States, 289 U.S. 466, 468, 53 S.Ct. 698, 77 L.Ed. 1321 (1933): "I think that every single word that man said, except when he agreed with the Government's testimony, was a lie;" and United States v. Murdock, 290 U.S. 389, 393, 54 S.Ct. 223, 78 L.Ed. 381 (1933): "* * * The court feels * * * that the Government has * * * proved that this defendant is guilty * * * beyond a reasonable doubt."

16. Accord: Wolcher v. United States, 218 F.2d 505 (9th Cir.) cert. denied, 350 U.S. 822, 76 S.Ct. 48, 100 L.Ed. 734 (1955).

Benatar v. United States, 209 F.2d 734 (9th Cir.), cert. denied, 347 U.S. 974, 74 S.Ct. 786, 98 L.Ed. 1114 (1954).

17. Compare, Mills v. United States, 164 U.S. 644, 649, 17 S.Ct. 210, 41 L.Ed. 584 (1897), Patterson v. United States, 183 F.2d 687, 690 (5th Cir.), cert. denied, 343 U.S. 951, 72 S.Ct. 1043, 96 L.Ed. 1352 (1952), and Nicola v. United States, 72 F.2d 780, 787 (3d Cir. 1934).

18. Specific criminal intent is of course not required in this misdemeanor prosecution. See Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

ship alone, becomes a co-conspirator. Knauer v. United States, 237 F. 8, 19–20 (8th Cir. 1916).[19] Knowledge and participation are required. Nor will proof of parallel business behavior alone conclusively establish agreement. Theatre Enterprises v. Paramount, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). But as against the two appellants the evidence shows much more. Because of the size of the record, we summarize and select therefrom.

Appellant Hedgpeth, some time prior to the present litigation, had devised pricing formulae for use in his own pharmacy. At the expiration of his term of office as President of appellant Association, he remained for a time as a member of the executive board. During this time he offered to prepare a prescription pricing schedule, which offer was accepted by the board. A committee of six pharmacy owners, with Hedgpeth as its chairman, undertook a pricing study. The committee deliberated on the inclusion in the proposed schedule of such items as the cost of materials, overhead, and markup. The committee ultimately agreed upon a schedule which Hedgpeth submitted to the executive board for approval. It was duly approved and the board agreed to print and distribute copies of the schedule to members. At the January, 1957, Annual Association Meeting copies were distributed to the members present, and for those who could not attend, a special mailing of the schedule was arranged and carried out. The schedule contained the following explanation:

"This Prescription Pricing Schedule is the result of much thought and study plus many hours of work.

"It is designed to make the pricing of prescriptions quick and easy, accurate and uniform.

"It is based on a realistic knowledge of labor and other costs and uses the general formula—cost plus a reasonable markup plus a professional fee. It is hoped that all pharmacy will be helped through the use of uniform pricing methods.

"Don Hedgpeth.

"Issued 1/28/57."

Subsequent to this initial distribution, the schedule was from time to time revised, mostly upward. During the period, Hedgpeth went about the state "explaining" the use of the schedule. In March or April, 1959, the Prescription Pricing Committee sent out 1100 questionnaires printed at Association expense to members of the Association asking whether or not they used the Hedgpeth Schedule. Of 372 replies received, 257 used the schedule. The questionnaire also asked whether the user was in favor of increasing prices, leaving them as they were, or in favor of a reduction. Sixty-seven percent of the users in San Francisco and eighty-six percent of the users outside San Francisco favored no change in prices. Nevertheless, after studying this survey, Hedgpeth and his committee rcommended *increasing* the prices. The recommendations of the committee were adopted by the executive board and a revised pricing schedule was printed and distributed on June 1, 1959.

The scale and character of the campaign undertaken by the Association in behalf of the widespread use of the schedule is revealed by the following excerpts from the record.

From the "President's Message of D. K. Hedgpeth:

"We can also change our thinking on another area of pricing. And as you might have already guessed, I am referring to that most important area in the whole drug store. The Prescription Department.

"In my humble opinion there is only one department over which (from a pricing standpoint) we have more or less complete control. Your

---

19. Nor is every sharcholder liable for corporate violations of the Sherman Act. Hartford-Empire Co. v. United States, 323 U.S. 386, 403, 65 S.Ct. 373, 89 L.Ed. 322 (1945).

Prescription Department not only yields the largest dollars and cents volume but it accounts for the lion's share of the Net Profit. A small increase in the price of each prescription filled will be reflected in a much greater Net Profit at the end of each year. I sincerely urge you all to reappraise your prescription pricing policy and bring it up to date. And remember the year is 1956 and not 1946. The heart of the drug store is the Prescription Department. It should be also the financial Backbone. Let's make it just that."

From the Minutes of the 1958 Annual Meeting:

"Mr. Hedgpeth gave a very constructive reasoning in the presentation of his prescription pricing schedule. It is money in the pocket of every pharmacist when he uses the Hedgpeth schedule."

From a speech by Association official James J. McGoldrick, January 25, 1958:

"The pricing schedule was vigorously promoted during the year and a new, intelligent approach to prescription pricing will be available for you at this meeting. This schedule, in its promotion, I feel, has been one of the greatest benefits to members of our association, and its intelligent application will add to better relations with the general public—for nothing causes more ill-will, or acts as a detriment to pharmacy, than ridiculously underpriced or overpriced prescriptions. Many of our members have found through the use of this schedule, a more sound and intelligent operation of their pharmacies. The hit and miss pricing of prescriptions is unethical and bad business practice."

From the Minutes of the board meeting, October 22, 1958:

"Following a report by Mr. Hedgpeth on prescription pricing, a discussion was held on the need for continued activity in urging use of the pricing schedule. It was sug-gested that wherever feasible, local meetings be organized to discuss the matter, at which Mr. Hedgpeth agreed to take part whenever his time and availability would permit."

From a letter of Charles R. O'Malley, Association Secretary, to a local pharmacist, March 12, 1959:

"Thank you for your note on the prescription pricing. The Hedgpeth schedule is being used by the majority of those pharmacists replying to the survey. Of 260 that replied, over 200 were out of San Francisco.

"We appreciate your frankness and at the same time are pleased to tell you that Don Hedgpeth has received many complimentary letters for the time and effort he has given to helping improve this situation."

From the Association bulletin, May 6, 1959:

"In announcing the new [1959] schedule, Don Hedgpeth emphasized the important reasons for its adoption: * * * (2) The industry-wide trend towards higher and more uniform prescription prices; * *."

From the said O'Malley's grand jury testimony:

"Question: Well, having attended the meeting was it your impression that the people at the meeting, the officers and directors and the committee members, and so on, having studied the pricing situation, were of the frame of mind that they should adopt the schedule and use it in pricing their prescriptions?

"Answer: Yes."

From the testimony of Association official Marsh Pine before the grand jury (also incorporated in the present record, as was the above.):

"Q. * * * wasn't one of the purposes in circulating, distributing this Hedgpeth schedule to secure some degree of uniformity in prescription prices in Northern California?

"A. That is a good statement.

"Q. It is not only a good statement, it is a correct statement, isn't it? A. Right."

And finally, from Pine's new testimony at trial:

"Q. * * * Was there any discussion as to why it should be known as the Hedgpeth schedule rather than the Northern California Pharmaceutical Association schedule?

"A. Well, Mr. Banks, I think that all of us recognized, possibly, that it would be illegal if the Association put out a schedule."

These are but a few examples of the evidence to be found in over 1000 pages of trial transcript. We detail it to this extent to illustrate that in the phrase of the trial judge, the evidence was not merely "sufficient," but was indeed, "overwhelming" on this point. It thus seems evident that the jury had sufficient facts before it to find participation by the Association and Hedgpeth in an agreement to establish uniform prices by urging the adoption and promotion of the Hedgpeth Schedule. While it is not shown that every member individually used the schedule, or participated in the agreement, such a showing is not required. Plymouth Dealers Ass'n of No. Cal. v. United States, 279 F.2d 128, 132–133 (9th Cir. 1960). And the inability of the Government to present a formal agreement is immaterial; what is required and was here provided is substantial evidence from which such an agreement can be inferred. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Bigelow v. RKO Radio Pictures, 150 F.2d 877 (7th Cir. 1945), rev'd on other grounds, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). On the matter of agreement to fix prices, the instant case is closely analogous to United States v. Nationwide Trailer Rental System, 156 F.Supp. 800, 804–806 (D.Kans.), aff'd mem. 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957), and is on all fours with United States v. Utah Pharmaceutical Association, 201 F.Supp.

29 (D.Utah, 1962), a decision the reasoning of which, and its result we find highly instructive and persuasive on the several issues involved herein.

Certain rulings of the trial court relative to the "agreement" element of the case are complained of. Appellants assign as error the exclusion of a survey of prescription prices in Northern California during the period covered by the indictment. The trial court excluded the survey on the grounds first, that it was hearsay because none of the underlying documents or pharmacists' statements upon which the survey was based were offered by appellants, and second, because it was irrelevant insofar as it was offered to show lack of actual use of the Hedgpeth Schedule. The exclusion was correct. The reasons given therefor by the trial court are adequate.

The trial court refused to permit one of appellants' witnesses to define the word "uniform" as used in the schedule. That was a question for the jury. Compare, United States v. Trenton Potteries Co., 273 U.S. 392, 407, 47 S.Ct. 377, 71 L.Ed. 700 (1927). The trial court excluded other organizations' pricing schedules and advertisements therefor. They were irrelevant to the charge under consideration. The trial court admitted into evidence the minutes of certain county pharmaceutical associations. Appellants charge this as error. Said associations were properly linked to the appellant Association through evidence other than said minutes sufficient to support a finding of their participation in the main conspiracy. Said evidence other than the minutes included relevant correspondence between these local associations and the Secretary of appellant Association. Compare Anthony v. United States, 256 F.2d 50, 55 (9th Cir. 1958), and Newman v. United States, 156 F.2d 8, 10 (9th Cir.), cert. denied, 329 U.S. 760, 67 S.Ct. 115, 91 L.Ed. 655 (1946). This case is if anything the *opposite* of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557 (1946), relied on by appellants. The Association and Hedgpeth here stand

in a like position to the conspirator Brown in Kotteakos, against whom the evidence of all the subsidiary conspiracies was obviously admissible, since he was the pivotal figure in all of them.

We have endeavored to cover all of appellants' numerous assignments and conclude that they are not sufficiently meritorious to warrant a reversal of this case.

Affirmed.