Chief Judge Breitel.
Appellant objectant, in a proceeding to settle an executor’s account, contests the amount of attorney’s fees awarded for services rendered to the estate. Object-ant, the son of decedent and sole beneficiary of his father’s estate, appeals from an Appellate Division order affirming the award, contending that the Surrogate was improperly influenced by the then existing Monroe County Bar Association minimum fee schedule. It is argued forcefully that, although the estate was considerable in value, there were no unusual difficulties and the large fee allowed was therefore unduly influenced by the schedule allowing a percentage based on the gross estate. It is urged, in particular, that the fee schedule effectively fixed the fee level for legal services in Monroe County and thus violated the State’s antitrust law (Donnelly Act, General Business Law, § 340).
The order should be affirmed. Although the Surrogate considered the minimum fee schedule, he made a sufficiently independent determination of the reasonableness of the fee allowed *6 and, in doing so, was entitled to consider custom and practice in the community. Moreover, the law is a profession and not a business and therefore not subject to the Donnelly Act which prohibits business arrangements restraining competition. Whether all Bar Association minimum fee schedules are, however, unprofessional, it is not necessary to decide in this case or at this time; but they may violate professional standards if their purpose or effect would be to control the fee level for professional services, or would have the purpose or effect of preventing “fee competition” in the rendering of legal services.
The gross estate aggregated some $329,000. Objectant was the sole beneficiary and eventually would receive the entire net estate. The fee allowed to the attorney for the estate was $13,250, which equalled almost precisely the amount that the then minimum fee schedule established by the Monroe County Bar Association would have required or “ suggested ” in decedents’ estates. There is no contention by respondent attorney or the amicus curiae Bar Association that the handling of the estate involved any but routine practice in a decedent’s estate.
The pertinent provisions of the State’s antitrust statute trace their origin to 1897 and 1933 (L. 1897, ch. 383; L. 1933, ch. 804, § 1; see, generally, New York State Bar Association Antitrust Section, Report of Special Committee to Study the New York Antitrust Laws, pp. 10a-20a [1957]; Maroney, Antitrust in the Empire State: Regulation of Restrictive Business Practices in New York State, 19 Syracuse L. Rev. 819 [1968]). Presently, section 340 of the General Business Law declares void and illegal against public policy “ [e]very contract, agreement, arrangement, or combination whereby * * * [competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any. service in this state is or may be restrained ”.
Objectant contends that, since the statute expressly includes the furnishing of service, lawyers who provide legal services are covered by the statute. The statutory reference to service was added in 1933, shortly after the decision in New York Clothing Mfrs’. Exch. v. Textile Finishers Assn. (283 App. Div. 444). It was there held that a price-fixing agreement among members of defendant association was not violative of *7 section 340 because the statute, as then written, did not apply to services.
Although there was no cause and effect relationship between the decision and the legislation, the addition of the term “ seridee ” was designed to prohibit anticompetitive practices of service industries. According to its draftsman, then Attorney-General Bennett, the 1933 amendment extended “ the protection of the law to all those businesses which sell, not a specific product or commodity, but a service such as laundering, dry cleaning, shoe repairing and numerous others ” (Bennett, The Recent Amendments to the Donnelly Act, 5 N. Y. State Bar Assoc. Bulletin 384, 389 [1933]). The view expressed by the then Attorney-General indicates that the use of the word “ service ” was confined to a commercial or business setting. The term was therefore used with a limited purpose, and therefore limited sense. Hence, whether arrangements in the legal profession, which concededly involves services, violate the antitrust law does not turn on the word “ service
On this analysis, the issue, as it would be under Federal antitrust law, is whether the legal profession is a business or trade as that term is used in section 340 (see United States v. Real Estate Bds., 339 U. S. 485, 489, 491-492 [1950]). "Whatever the authority of Goldfarb v. Virginia State Bar (355 F. Supp. 491),[1] where the court held that minimum fee schedules violated the Sherman Act, the question now presented deals solely with the relationship of the State antitrust law to the statutory scheme for regulating the practice of law.
A profession is not a business. It is distinguished by the requirements of extensive formal training and learning, admission to practice by a qualifying licensure, a code of ethics imposing standards qualitatively and extensively beyond those that prevail or are tolerated in the marketplace, a system for discipline of its members for violation of the code of ethics, a duty to subordinate financial reward to social responsibility, and, notably, an obligation on its members, even in nonprofessional matters, to conduct themselves as members of a learned, disciplined, and honorable occupation. These qualities distinguish professionals from others whose limitations on conduct are largely prescribed only by general legal standards and sanc *8 tions, whether civil or criminal. (See Pound, The Lawyer from Antiquity to Modern Times, pp. 4—10.) Interwoven with professional standards, of course, is pursuit of the ideal and that the profession not be debased by lesser commercial standards (see Drinker, Legal Ethics, pp. 210-273). Departures from the ideal, few or many, should rarely, if ever, justify a lowering of the standards (cf. Ryan, Address to the Graduating Law Students of the University of Wisconsin, 1873, 19 Notre Dame Lawyer 117, 135-140 [1943]).
Given this character of any profession, and certainly as that character is applied to the legal profession, professional associations justify their existence to the extent that they further the standards and the ideal (see, e.g., Botein, Six Decades of Achievement, 25 N. Y. County Lawyers’ Assn. Bar Bulletin, p. 205 [1968]; see, also, Pound, op. cit., supra, pp. 10-20).
Bar Associations have, of course, been pre-eminent in pursuit of the professional ideal. As a consequence, they have been used under legislation and by the courts in the control of conduct in the profession (see, e.g., Matter of Bar Assn. of City of N. Y., 222 App. Div. 580). Their role in the promulgation and interpretation of canons of ethics and in professional disciplinary machinery has been quite extensive (see, e.g., Association of the Bar of the City of New York and New York County Lawyers’ Assn., Opinions of Committees on Professional Ethics [1956] ; 22 NYCRR 603.12, 691.12, 800.28, 1022.9).
Another index of professionalism in the Bar, especially in modern times, is that the organized Bar both sponsors and fosters research, programs and proposals unrelated to the development of individual skills. Instead these activities are designed to extend the capacity of the Bar to serve the public; even beyond the likelihood of financial reward for such service (see, e.g., Association of the Bar of the City of New York, Mental Illness, Due Process and the Criminal Defendant [1968]).
The history and purpose of the legal profession and the professional associations supports the view that the profession is not included within the terms “ business or trade ” as used in section 340 of the General Business Law. The several provisions in the Judiciary Law regulating the conduct of members of the Bar suggest particularly close restrictions on the *9 profession (see, e.g., Judiciary Law, §§ 480-487). Before that, by ancient tradition, rules of conduct were established for the profession (see, e.g., VI Holdsworth, History of English Law 433 [1924]). Today, specific statutes provide for broad judicial power and control over the profession (Judiciary Law, § 90, subd. 2; see Gair v. Peck, 6 N Y 2d 97, 111, app. dsmd. and cert, den., 361 U. S. 374; People ex rel. Karlin v. Culkin, 248 N. Y. 465, 469, 471-472).
Even a superficial examination of the regulatory system applicable to the Bar suggests that if the Legislature had intended to reach alleged economic restraints, like fee schedules, it would have done so either by specific statute, or by court rules and controls within the existing scheme for judicial oversight of the Bar. Judicial regulation would, as with contingent fees and the like, be much more expeditious, effective, and direct than the comparatively clumsy device of antitrust law enforcement.
Consequently, it is concluded that neither by virtue of the statutory language, the legislative history, or intent of the Legislature does the Donnelly Act apply to the legal profession.
It would be injudicious, however, to pass over the issues raised by the parties without considering whether standards of professional conduct, apart from antitrust law, were involved.
Long tradition and just about a universal one in American practice is for the fixation of lawyers’ fees to be determined on the following factors: time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer’s experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved (see Matter of Potts, 213 App. Div. 59, 62, affd. 241 N. Y. 593; Code of Professional Responsibility EC 2-18; Canons of Professional Ethics, canon 12; Ann., Attorney Compensation — Amount, 56 ALR 2d 13, 20-50; see, also, H. Cohen, History of the English Bar and Attornatus to 1450, p. 279 [1929]). Significant in the inclusion is the factor of the amount involved. It is in the light of these principles plus the exercise of an independent judgment by the Surrogate, an exercise of discretion affirmed by. the Appellate Division, that an affirmance is indicated. It can *10 not be said, as a matter of law, therefore, that the fee schedule violated professional standards or was improperly used by those vested with discretion.
Although it is true that the Surrogate in fixing the fee in this case considered the Bar Association minimum fee schedule, that alone would not render his determination improper, even if it were improper for a court in fixing a reasonable fee to rely exclusively on an association fee schedule (see Matter of Levy, 19 A D 2d 413, 416; Matter of Snell, 17 A D 2d 490, 494; see, also, Matter of McCullough, 14 Misc 2d 769, 771, affd. 10 A D 2d 634, affd. 9 N Y 2d 993). The schedule may be used to determine the customary fee in the community, but only if it reflects an existing practice and not if its purpose or effect may be to impose minimum fees. The Surrogate indicated that he had made an independent determination, and the Appellate Division affirmed. This court then has findings before it, which it is powerless to overturn on this record, that the Surrogate made an independent determination and that the fees allowed were reasonable (Matter of Noll, 273 N. Y. 219, 225-226). In the absence of extrinsic evidence that the fee schedule in fact worked as a “ price-control ” device or was so intended, this court may not, as it would with an issue of law, overturn the findings of fact or the conclusion to which they lead (see Cohen and Karger, Powers of the Mew York Court of Appeals, 590).
It should be observed that the present treatment of minimum fee schedules is against a backdrop in which the fees are fixed not by lawyer and client but by the court. When there is direct control by the court, so long as it reaches an independent determination of what is reasonable, questions as to professional propriety, as discussed later, in setting the fees are absent. The situation would undoubtedly be different where the fee schedules relate to fees fixed by agreement between lawyer and client. In such instances, although there is residual control by the courts over excessive fees, that residual control may be too feeble in preventing fee schedules from having a great effect on the fees charged and which under traditional rules courts would not overturn (see 3 N. Y. Jur., Attorney and Client, §§ 92-98).
In this context it is useful to compare direct court control over fees in tort cases involving infant plaintiffs, court control in the First and Second Departments over maximum fees *11 in personal injury cases generally (see 22 NYCRR 603.4, 691.4), setting of fees in lawyers’ clients cases under section 475 of the Judiciary Law, counsel fees in stockholders’ derivative actions and class actions, and other examples which might come to mind. All of these would seem to be situations in which the direct control of fees by the court preclude issues of professional impropriety so long as the court exercises independent judgment and uses fee schedules in the guarded way mentioned earlier.
Were evidence present, or if it appeared unequivocally from the schedule itself, that a price-fixing arrangement were involved, there would undoubtedly be a serious issue whether unprofessional practices were present. This would be so because concerted conduct to produce as a primary purpose a certain minimum financial reward would be unprofessional and because the mínimums would not necessarily be keyed to what the courts or the profession should regard as reasonable (compare Arnould & Corley, Fee Schedules Should be Abolished, 57 A.B.A.J. 655 [1971] with Miller & Weil, Let’s Improve, Not Kill Fee Schedules, 58 A.B.A.J. 31 [1972]). It is notable that earlier Monroe County Bar Association schedules, since abolished,[2] had language that strained the limits of mere suggestion. But whatever the language, if it were only a disguise for a coercive purpose, the same serious issue would be raised.
Assuming that unprofessional practices were involved in the use of minimum fee schedules, such practices would, of course, be cognizable in judicial supervision, particularly in the Appellate Divisions, over the practice of law. Barely, if ever, would such an issue be presentable, as mentioned earlier, in litigation between client and lawyer with respect to fees based on voluntary agreement (see 3 N. Y. Jur., Attorney and Client, §§ 92-98).
It is interesting that neither respondent nor amicus curiae have, in their submissions, established need for the minimum fee schedule, or that similar needs have existed generally, or *12 to explain why in other parts of the State the nse of minimum fee schedules does not seem to be correlated with population, urbanization, or other social factors which might explain either the use or nonuse of minimum fee schedules. Quite unpersuasive would be the argument that fee schedules are an indirect way of discouraging solicitation. If fee schedules are otherwise objectionable than the methods are too indirect and too strong for an ill that is otherwise curable (see Note, A Critical Analysis of Bar Association Minimum Fee Schedules, 85 Harvard L. Rev. 971, 988 [1972]; Note, Wisconsin Minimum Fee Schedule: A Problem of Antitrust, 1968 Wis. L. Rev. 1237, 1256).
Fortunately, this case does not require that the issue be faced frontally. If it did, it would have been useful to have had available the kind of empirical data which would bear on the use, need, and effect of minimum fee schedules and the effect of their absence.
Accordingly, the order of the Appellate Division should be affirmed, with costs to the parties payable out of the estate.

. Revd. 42 U. S. Law Week 2581 (Ct. of Appeals, 4th Cir.).— [Rep.

. In response to an inquiry by the Antitrust Division of the United States Department of Justice, the Monroe County Bar Association • abolished and abandoned its- Bar fee schedules. The American Bar Association has recommended that local and State Bar Associations “give serious consideration to withdrawal or cancellation of all schedules of fees ” (American Bar Association, House of Delegates Mid-Year Meeting, Houston, Texas, Feb. 4-5, 1974, P- 12).