**UNITED STATES of America,**
**Plaintiff,**

v.

**OREGON STATE BAR, Defendant.**

No. 74-362.

United States District Court,
D. Oregon.

Nov. 25, 1974.

8. *See, also* 45 U.S.C. § 55.

James E. Figenshaw, Antitrust Div. Dept. of Justice, San Francisco, Cal., Sidney I. Lezak, U. S. Atty., District of Oregon, Portland, Ore., for plaintiff.

Manley B. Strayer of Davies, Biggs, Strayer, Stoel & Boley, Portland, Ore., for defendant.

## DECISION AND ORDER

MORELL E. SHARP,* District Judge.

The United States brings this civil action to enjoin the Oregon State Bar from further publication, distribution or suggestion of a schedule of attorneys' fees. The complaint is filed and jurisdiction obtained under Section 4 of the Sherman Act, 15 U.S.C. § 4, alleging violation of Section 1 of the Act, 15 U.S.C. § 1. The Government alleges that defendant and various of its members and officers are engaged in an illegal conspiracy to fix prices. Only the Oregon State Bar is made a defendant to this suit.

The defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56, asserting two legal defenses. First, defendant argues that the "state action" doctrine exempts its activities from Sherman Act scrutiny. Second, defend-

ant claims that its activities are immune from antitrust suit by the "learned profession" exemption to the Sherman Act "trade or commerce" requirement.

The applicability of these two special exemptions is the only issue raised by defendant's motion. The Sherman Act validity of the fee schedule itself, viewed without regard to special exemptions, is not before the Court. The parties do not dispute any facts material to this motion.

In 1935 the Oregon legislature passed an act providing that all lawyers in the state must be members of the Oregon State Bar "which hereby is created an agency of the state to carry out the provisions of this Act." Ch. 28, Oregon Laws of 1935. Under the act as amended to date the Oregon State Bar is "a public corporation and an instrumentality of the Judicial Department of the government of the State of Oregon." O.R.S. 9.010.

A Board of Governors, elected by the membership, "is charged with the executive functions of the state bar and shall at all times direct its power to the advancement of the science of jurisprudence and the improvement of the administration of justice." O.R.S. 9.080. The Board of Governors is empowered, with the approval of the State Bar, to formulate rules of professional conduct; and when such rules are adopted by the Supreme Court, the Board has the power to enforce them. O.R.S. 9.490. Pursuant to this authorization, the Board of Governors formulated a Code of Professional Responsibility which was adopted by the Oregon Supreme Court on December 30, 1970, effective that date.[1]

Canon 2 of the Code states:

"A lawyer should assist the legal profession in fulfilling its duty to make legal counsel available."

---

* Honorable Morrell E. Sharp, United States District Judge for the Western District of Washington, designated by order of the Chief Judge of the Court of Appeals for the Ninth Circuit to sit in attendance on this case in Oregon.

1. With one exception not here relevant, this Code is identical to the Code of Professional Responsibility adopted by the American Bar Association on August 12, 1969, effective January 1, 1970.

Disciplinary Rule 2–106, which accompanies this canon, provides:

"DR2–106 FEES FOR LEGAL SERVICES.

(A) A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) *The fee customarily charged in the locality for similar legal services.*

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

(C) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for respresenting a defendant in a criminal case." (Emphasis supplied)

The State Bar is charged with the responsibility of investigating complaints as to the conduct of attorneys and filing its recommendations with the Supreme Court. The Supreme Court, after notice and hearing, may affirm, adopt, modify, reverse or reject a recommendation; and may disbar, suspend or reprimand the attorney for breach of the statutory duties or the Code of Professional Responsibility. O.R.S. 9.541–9.580.

On June 1, 1969, the Oregon State Bar published and distributed to its members a "Schedule of Minimum Fees and Charges." This schedule was prepared by the Bar's Committee on Economics of Law Practice. The duties and responsibilities of this committee are not defined by statute nor by bylaws of the Bar.

On April 1, 1973, the Oregon State Bar published and distributed to its members a "schedule of Suggested Fees and Charges." This schedule was a revision of the 1969 schedule made by various permanent employees of the Bar.

Both the 1969 and 1973 schedules were adopted and approved by the Board of Governors. Neither schedule was adopted or approved by the Oregon Supreme Court nor by the Oregon State Legislature.

## I. THE "STATE ACTION" DOCTRINE

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

"Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is [hereby] declared to be illegal . . . ."

While "[i]mmunity from the antitrust laws is not lightly implied," California v. Federal Power Commission, 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962), an exemption from antitrust law coverage for the activities of a state was carved out by the Supreme Court thirty-one years ago. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The defendant in the instant case argues that this state action doctrine exempts its activities from Sherman Act attack.

The dimensions of this state action exemption have never been clear. Much

**510**

of the language in Parker v. Brown, *supra*, generates confusion rather than clarification. Thus, while the Court exempts "state action or official action directed by a state," it declares that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351, 63 S.Ct. at 314.

The line between immunity and illegality can be made less uncertain by an examination of the facts in *Parker*. In that case, a producer and packer of raisins challenged the raisin proration marketing program established pursuant to the California Agricultural Prorate Act. The program severely restricted the free marketing of raisins. Several factors figured significantly in the Court's analysis. First, the California Agricultural Prorate Act specifically authorized the establishment of proration marketing programs which would restrain competition and maintain prices. Second, although private producers were involved in the petition for, formulation of, and administration of the program, the program was not effective until approved by a state commission following at least two public hearings. This commission was composed of the state Director of Agriculture and eight gubernatorial appointees. Third, the Court found that the California scheme dovetailed with the federal Agricultural Adjustment Act, which authorized the Secretary of Agriculture to impose similar marketing restrictions and which recognized the existence of state programs.

Thus, the Court stated, 317 U.S. at 350–351, 63 S.Ct. at 313:

"But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which

suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

The most recent discussion of Parker v. Brown is found in New Mexico v. American Petrofina, Inc., 501 F.2d 363 (9th Cir. 1974), where the court concluded that if a state itself is the defendant in an antitrust suit, no further analysis is required before dismissing the claim pursuant to the state action doctrine. However, when the state is not the named defendant, the court must engage in a comprehensive examination of the legislative will. The court stated, at pp. 369–370:

"But these cases [in which the state itself is not the defendant] involved suits against allegedly private defendants who defended on the basis that the state has authorized their anticompetitive conduct. The alleged authorization is normally either a putative regulatory scheme or a state created corporation intended to manage a monopoly in the public interest.

"In either situation, it is necessary to determine whether the anti-competitive result actually is a goal of the state entitled to the state's immunity rather than a private group masquerading under the banner of 'state action.' Such a determination necessarily involves an inquiry into legislative motives, and courts are understandably reluctant to apply the state's immunity to private parties without a clear indication by the state's legislature that the anti-competitive results have its sanction.

"But there is no indication from those cases that the legislature must declare its intent to supplant competition in an industry when there is no

question that the conduct is committed by the state. Since the suit here is directly against the state, there can be no such question, and the *Whitten* analysis is inapplicable. The 'legislative mandate' test is useful, indeed possibly necessary, when there is doubt if the defendant or the regulatory scheme is really an instrument of the state. But when there is no doubt that the defendant is the state, the 'legislative mandate' analysis is unnecessary.

"This conclusion comports with the reliance in *Parker* upon a 'legislative mandate'. After declaring that the Sherman Act is inapplicable to states, the Court seemingly turned to the question whether the plan was really the act of the state, noting that 'a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.' From what follows in the Court's opinion, it appears that the Court was responding to the obvious point that since the Commission was comprised of industry leaders and the plan was formulated by industry representatives, the plan was nothing more than a private agreement disguised as state action. It was apparently to this obvious *objection* that the Court responded when it relied upon the legislative regulatory policy and the fact that the commissioners were gubernatorial appointees. Thus, the Court was merely relying on the legislative mandate to conclude that the plan was the product of the state; it did not conclude that state action is immune from antitrust liability only when directed by the legislature as part of an anti-competitive regulatory scheme." (footnotes omitted)

In the instant case, the defendant is not the state of Oregon, but is a public corporation and an instrumentality of the Judicial Department. Since the defendant is comprised of private attorneys, and since the fee schedule is formulated by private attorneys, the *Parker* "legislative mandate" test must be applied to determine whether the fee schedule promulgated is the action of the state.

■ There is no Oregon statute specifically authorizing the promulgation of an attorneys' fee schedule; nor, of course, is there a federal statute explicitly recognizing or implicity authorizing the formulation of such fee schedules. In addition, the fee schedules published and distributed by the defendant were neither debated in public hearings nor approved by a disinterested state commission. In short, there is not the substantial state direction and involvement required to meet the legislative mandate requirements and to elevate these Oregon State Bar activities to the plateau of "state action" immunity.

Defendant argues vigorously that invalidation of fee schedules would threaten the ethical structure of the legal profession, noting the prohibition on "clearly excessive" fees in DR2–106, Code of Professional Responsibility. It also cites several cases which refer to fee schedules in the determination of reasonable fees, with apparent approval.[2] However, neither the Code of Professional Responsibility nor the cited case law amounts to a "legislative command" that the defendant formulate a fee schedule.[3] The prohibition on "clearly excessive" fees can certainly be enforced without the existence of an official fee schedule, one which does not encompass all types of legal work anyway. A sug-

2. *See, e. g.,* Junker v. Junker, 188 Neb. 555, 198 N.W.2d 189 (1972); State ex rel. Baker v. County Court, 29 Wis.2d 1, 138 N.W.2d 162 (1965); Cox v. State Ind. Accident Comm., 168 Or. 508, 123 P.2d 800 (1942).

3. At oral argument the Government conceded the validity of DR2–106 itself, which has

been adopted and approved by the Oregon Supreme Court pursuant to a specific Oregon statute. Neither in briefs nor at argument did either party mention EC2–18, which refers to suggested fee schedules. Apparently, the parties recognize that the Ethical Considerations, unlike the Disciplinary Rules, are not mandatory in character.

gested fee schedule has never set a ceiling on attorneys' fees; on the contrary, it has tended to establish a comfortable floor below which such fees need not fall. And the court use of suggested fee schedules is not sufficient to stamp them with the imprimatur of the state legislature.

Other cases have addressed this problem. In Asheville Tobacco Board of Trade, Inc. v. Federal Trade Commission, 263 F.2d 502 (4th Cir. 1959), another leading case on the state action doctrine, the Fourth Circuit held that the state action doctrine did not exempt local tobacco boards of trade from the antitrust laws. These boards of trade, authorized by state statute to regulate tobacco auctions, were not supervised in any manner by state officials. The regulations, then, were essentially formulated by private businessmen to govern their own conduct, much as the fee schedules at issue here were formulated by private attorneys for their own use. The value of Asheville as authority against the defendant is questionable, though, since the Fourth Circuit distinguished the case in Goldfarb v. Virginia State Bar, 497 F.2d 1 (4th Cir. 1974), cert. granted, —— U.S. ——, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974).

In George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970), cert. denied, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), the First Circuit held that the Parker exemption does not apply to the action of a public agency in approving specifications for competitive bids. Although the factual context of Whitten is significantly different from the case at bar, the following language, 424 F.2d at 30, has been quoted with apparent approval by the Ninth Circuit in Petrofina, supra, 501 F.2d at 368–369:

"The [Parker] Court's emphasis on the extent of the state's involvement precludes the facile conclusion that action by any public official automatically confers exemption. As one commentator has observed, the assertion

that an act is 'valid governmental action * * * suggests inquiry rather than ends it. * * * Generally, the underlying issue in determining the applicability of such an exemption is the degree of governmental involvement in, and supervision over, the allegedly wrongful private activity.' Comment, Alabama Power Company v. Alabama Electric Cooperative, Inc., 55 Va.L.Rev. 325, 345–346 (1969). Our reading of Parker convinces us that valid government action confers antitrust immunity only when government determines that competition is not the summum bonum in a particular field and deliberately attempts to provide an alternate form of public regulation."

In concluding that the Oregon State Bar activities in question here are not exempt "state action," I have considered carefully the recent Fourth Circuit decision dealing with the validity of attorneys' fee schedules, Goldfarb v. Virginia State Bar, supra. That case is a class action brought on behalf of homeowners against the Virginia State Bar and the Fairfax County Bar Association. The court held that the State Bar is exempt from antitrust liability because of the Parker state action doctrine. I am not persuaded by the reasoning of the court.

The Goldfarb court read Parker as establishing three requirements for exemption of an activity as state action: (1) it must benefit the public; (2) it must be actively supervised by independent state officials; and (3) it must have received its authority and efficacy from legislative command.

First, the court found that the primary benefits of the Code of Professional Responsibility accrue to the public, and that the fee schedule, as part of the same general regulatory scheme, should not be invalidated simply because it also benefits individual attorneys. In my opinion, this reasoning is unsound. Not only is the fee schedule not a part of the Code, but it is not even necessary for the regulation of the bar for public ben-

efit. The fee schedule should be examined apart from the general regulatory scheme; such an examination would disclose little public benefit. *See* Note, Bar Association Fee Schedules and Suggested Alternatives: Reflections on a Sherman Exemption That Doesn't Exist, 3 U.C.L.A.—Alaska L.Rev. 207, 236–43 (1974); Note, A Critical Analysis of Bar Association Minimum Fee Schedules, 85 Harv.L.Rev. 971 (1972); Note, The Wisconsin Minimum Fee Schedule: A Problem of Antitrust, 1968 Wis.L.Rev. 1237, 1253–58.

Second, the court held that the Virginia state court's inaction with regard to specifically approving or disapproving fee schedules should be construed as active supervision by independent state officials since the court has the authority to regulate the bar. I do not think that such consent by silence meets the *Parker* test. Additionally, the parties thereto stipulated that the Virginia court gave authority to the State Bar to issue suggested fee schedules. No such authority has been given by the Oregon Supreme Court.

Third, in *Goldfarb* the parties also stipulated that the regulation program received its authority and efficacy from legislative command. No such stipulation exists in the instant case. And even so, reliance on the stipulation in *Goldfarb* begged the question, for the issue was whether the promulgation of fee schedules was authorized by the legislature, not whether the general regulation of attorneys was so authorized.

In sum, the *Goldfarb* case, on which the defendant relies heavily, is unpersuasive; since it is not binding precedent, this court chooses not to follow it.[4]

## II. THE "LEARNED PROFESSION" EXEMPTION

Section 1 of the Sherman Act, 15 U. S.C. § 1, prohibits conspiracies in restraint of "trade or commerce." The defendant argues that its activities do not constitute "trade or commerce" because it is engaged in a "learned profession." The existence *vel non* of a "learned profession" exemption to the Sherman Act has not been determined conclusively by the Supreme Court; an analysis of this question must of necessity depend on the implications of several Supreme Court cases which approach without reaching this issue.

Limitations on the scope of the term "trade" originated with The [Schooner] Nymph, 18 F.Cas. pp. 506, 507 (No. 10,388) (C.C.D.Me.1834), in which Justice Story, concluding that fishing was a trade within the Coasting and Fishery Act of 1793, stated:

"The argument for the claimant insists, that 'trade' is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word 'trade' is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. *Wherever any occupation, employment, or business is*

---

4. One final argument by plaintiff should be mentioned. Plaintiff argues that, even if the Oregon legislature has mandated some limitations on competition among attorneys, the defendant must show that its actions constitute the least restrictive alternate available to achieve the desired end. In support of this proposition, plaintiff cites Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), a case which reconciled the Securities Exchange Act with the antitrust laws. The Court held that the powers of self-regulation granted the Exchange did not give it unbridled immunity from the antitrust laws, but only that immunity required to enable the Exchange to achieve the aims of the Securities Exchange Act.

*Silver* does not involve the state action doctrine. Whether the *Silver* analysis regarding reconciliation of two federal statutory schemes should apply to the instant case is an issue this court does not reach since I conclude that the Oregon legislature has not directed the defendant to limit fee competition.

*carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade.* Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoe-maker, though some of these may be, and sometimes are, carried on without buying or selling goods. . . . " (Emphasis added)

The reference to "learned professions" is dictum since the case holds that fishing is within the scope of the term "trade."

In Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 436, 52 S. Ct. 607, 76 L.Ed. 1204 (1932), the Supreme Court quoted the above passage with apparent approval in construing the scope of the "trade or commerce" clause in Section 3 of the Sherman Act, 15 U.S.C. § 3. But there also the "learned profession" language is dictum since the Court held that a conspiracy to fix prices for cleaning, dyeing and renovating clothes was covered by the Sherman Act.

The Supreme Court again reproduced the Story quotation in United States v. National Association of Real Estate Boards, 339 U.S. 485, 490–491, 70 S.Ct. 711, 94 L.Ed. 1007 (1950), another Sherman Act Section 3 case. Once again the "learned profession" reference is dictum since the Court held that a conspiracy to fix real estate commissions was prohibited by the Sherman Act. The Court stated, 339 U.S. at 491–492, 70 S.Ct. at 715:

"The fixing of prices and other unreasonable restraints have been consistently condemned in case of services as well as goods. . . . Chief Justice Groner made an extended analysis and summary of the problem in United States v. American Medical Ass'n, 72 U.S.App.D.C. 12, 16–20, 110 F.2d 730, 707–711, where the Court of Appeals for the District of Columbia held that the practice of medicine in the District was a 'trade' within the

meaning of § 3 of the Act. Its conclusion was that the term included 'all occupations in which men are engaged for a livelihood.' *We do not intimate an opinion on the correctness of the application of the term to the professions.* We have said enough to indicate we would be contracting the scope of the concept of 'trade,' as used in the phrase 'restraint of trade,' in a precedent-breaking manner if we carved out an exemption for real estate brokers. . . . " (Emphasis added)

Significantly, the *Real Estate Boards* opinion does not cite Federal Trade Commission v. Raladam Co., 283 U.S. 643, 653, 51 S.Ct. 587, 592, 75 L.Ed. 1324 (1931) (dictum), where the Court stated that medical practitioners "follow a profession and not a trade." This *Raladam* dictum, then, presumably has little current import. Nor did the Court in American Medical Association v. United States, 317 U.S. 519, 528, 63 S.Ct. 326, 87 L.Ed. 434 (1943), refer to *Raladam.* Instead, the Court stated that it need not reach the question whether a physician's practice constitutes "trade" under Section 3 of the Sherman Act. Evidently, then, the Supreme Court does not feel that it has already carved out any "learned profession" exemption.

On the other hand, the Supreme Court does recognize that some competitive practices prevalent in the business world may not be acceptable for the professions. Thus, in United States v. Oregon State Medical Society, 343 U.S. 326, 336, 72 S.Ct. 690, 697, 96 L.Ed. 978 (1952) (dictum), the Court stated:

"We might observe in passing, however, that there are ethical considerations where the historic direct relationship between patient and physician is involved which are quite different than the usual considerations prevailing in ordinary commercial matters. This Court has recognized that forms of competition usual in the business world may be demoralizing to the ethical standards of a profession.

Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608 [55 S.Ct. 570, 79 L.Ed. 1086]."

The cited *Semler* case dealt with state regulation of advertising by dentists, not with fee schedules. Even should fee schedules be invalidated under the Sherman Act, ethical considerations could still be sufficient to sustain prohibitions on solicitation and advertising.

The only other Supreme Court statements in this area are found in the series of sports cases beginning with Federal Baseball Club v. National League, 259 U.S. 200, 209, 42 S.Ct. 465, 466, 66 L.Ed. 898 (1922), where the Court, in holding baseball exempt from the Sherman Act, stated that "personal effort, not related to production, is not a subject of commerce." This much criticized decision has never been extended to other professional sports, having been characterized by the Supreme Court itself as "an aberration." Flood v. Kuhn, 407 U.S. 258, 282, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). *See also* Haywood v. National Basketball Association, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971); Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L. Ed.2d 456 (1957); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955).

Supreme Court cases thus leave open the question whether there is a "learned profession" exemption to the Sherman Act. It is instructive to examine decisions of other courts regarding this issue.

The only circuit court case dealing with the status of the legal profession itself under the Sherman Act is the above-discussed *Goldfarb* opinion. The district court in *Goldfarb* had declined to declare the existence of any "learned profession" exemption, stating, "Certainly fee setting is the least 'learned' part of the profession." Goldfarb v. Virginia State Bar, 355 F.Supp. 491, 495 (E.D. Va.1973).

The Fourth Circuit, however, reversed this part of the district court decision, stating, 497 F.2d at 13:

"Throughout the development of federal antitrust law there has been judicial recognition of a limited exclusion of 'learned professions' from the scope of the antitrust laws. This exclusion is not a favor bestowed upon professionals by the courts as a 'professional courtesy'; the exclusion arises from the language of the statutes and the peculiar nature of the services rendered."

The court bases its decision on two Supreme Court cases, Federal Trade Commission v. Raladam Co., *supra*, and Federal Baseball Club v. National League, *supra*. As we have already seen, the "learned profession" dicta in these two cases have no current vitality; *Goldfarb*, then, actually forges a new exemption to the Sherman Act.

The *Goldfarb* decision was based in large part on policy considerations. The court noted that the usual competitive forces do not operate in the realm of attorney-client relations. The court stated, 497 F.2d at 14:

"The legal profession has rejected the maxim of *caveat emptor* as a standard of conduct. Unlike the mechanic or the butcher, a lawyer has a professional duty to provide his services at a reduced rate to those who need but cannot afford his services. Advertising and other forms of solicitation of business common to trade and commerce are criminal acts when utilized by lawyers. In view of the special form of regulation already imposed upon those in the legal profession the courts have been reluctant to superimpose upon the profession the sanctions of the antitrust laws, many of which are in direct contravention of existing legal and ethical restrictions." (footnotes omitted)

In addition, the defendant in the instant case cites several cases which stress the confidential and fiduciary relationship

between attorney and client, and the duty of the profession to make legal services available even to those who cannot afford them.[5] It argues that, in light of the high standards and duties of the legal profession, the ordinary price competition for business has no place. The New York Court of Appeals accepted these arguments in its construction of the New York state antitrust statute, holding that judicial control over the profession, rather than antitrust law enforcement, was intended by the legislature. Lincoln Rochester Trust Co. v. Freeman, 34 N.Y.2d 1, 355 N.Y.S.2d 336, 311 N.E.2d 480 (1974).

■■ Defendant's policy arguments, of course, deserve serious consideration. There are indeed many factors which might convince a lawmaking body that the legal profession should not be subjected to all the rigor of the Sherman Act. However, the creation of exemptions to the Sherman Act is the province of Congress, not the courts. United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); *see also* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It is not for this court to create a new exemption to the Sherman Act for so-called "learned professions."

■ Furthermore, the argument for exempting price-fixing activities of a "learned profession" is significantly weaker than the argument for exemption of other professional activities. Price-fixing is a *per se* violation of the Sherman Act. United States v. Socony-Vacuum Oil Co., *supra*. Most restraints of competition are subject to the "Rule of Reason," which calls for balancing the various harms and benefits occasioned to the public by the conduct in question. Thus, even though fee schedules are not immune from Sherman Act scrutiny, the professional bans on solicitation and advertising may still survive

—if the public benefit from these ethical canons outweighs the competitive harm.

Several cases have indicated that a viable line might be drawn between the "commercial" and "noncommercial" activities of a profession, exempting only the latter from the Sherman Act. *See, e. g.,* Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., 139 U.S.App.D.C. 217, 432 F.2d 650 (1970), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); Northern California Pharmaceutical Association v. United States, 306 F.2d 379 (9th Cir. 1962), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962).

In *Northern California Pharmaceutical Association, supra,* the Ninth Circuit considered and rejected defendants' argument that the "learned professional" status of pharmacists exempted their drug price-fixing agreement from the Sherman Act. The court stated, 306 F. 2d at 385:

> "In short, it is in an area of 'entrepreneurial,' rather than professional activity, that appellants are charged with having run afoul of the Sherman Act. . . ."

And at 386 the court stated:

> "We do not decide that every action of professionals is within the reach of the Sherman Act. We do decide that an agreement among professionals to fix a commodity price is."

In *Marjorie Webster Junior College, supra,* the D. C. Circuit held that defendant's school accreditation activities were immune to antitrust law attack. The court stated, 432 F.2d at 654:

> "[T]he proscriptions of the Sherman Act were 'tailored * * * for the business world,' not for the noncommercial aspects of the liberal arts and the learned professions." (footnotes omitted)

---

5. *See, e. g.,* United States v. Dillon, 346 F.2d 633 (9th Cir. 1965), cert. denied, 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966); Barton v. State Bar of California, 209 Cal. 677, 289 P. 818 (1930); Sands v. Purcell, 11 Or.App. 614, 504 P.2d 768 (1972).

■ This adoption of a "commercial/noncommercial" activity dividing line is perhaps just an application of the "Rule of Reason." Be that as it may, there is no more commercial element to the practice of law than the setting of fees. Thus, even the acceptance by this Court of the exemption of noncommercial professional activities from the Sherman Act would not save defendant's fee schedules.

It is the conclusion of this Court that the fee schedule activities of the defendant, Oregon State Bar, are not immune to Sherman Act attack by either the "state action" doctrine or by the "learned profession" exemption. Accordingly, defendant's motion for summary judgment is denied.