■ In the Matter of JUDY KEELE, an Incapacitated Person. DIAHN W. MCGRATH, Appellant; PUBLIC ADMINISTRATOR OF THE COUNTY OF NEW YORK, Respondent. [760 NYS2d 24] —Order, Supreme Court, New York County (Edward Lehner, J.), entered September 19, 2001, which, to the extent appealed from as limited by the brief, granted the fee request of appellant Diahn McGrath, an attorney, for services rendered in this Mental Hygiene Law article 81 guardianship proceeding, only to the extent of awarding her $5,000, affirmed, without costs. Appeal from a decision, dated June 1, 2001, dismissed, without costs, as taken from a nonappealable paper.

The court properly declined to award appellant additional fees for services rendered prior to February 18, 1998 since she was fully compensated for such services pursuant to the parties' stipulation, the result of vigorous motion practice and eve-of-fee-hearing settlement negotiations.

Also barred by the stipulation was the "premium" legal fee sought by appellant for finding an almost $2 million Swiss bank account belonging to Ms. Keele, the subject of this Mental Hygiene Law article 81 proceeding. Nor does it avail appellant to claim entitlement, on a quantum meruit basis, to a legal fee for over 400 hours of unbilled time, since where, as here, an attorney stipulates to her compensation, there can be no legitimate expectation on the attorney's part of additional compensation (see Landcom, Inc. v Galen-Lyons Joint Landfill Commn., 259 AD2d 967, 968 [1999]). We note in addition that, absent a written contingency fee agreement, appellant is not entitled to a "bonus" based on a favorable outcome (see Liner Tech. v Hayes, 213 AD2d 881 [1995]).

According to the order appointing them coguardians, Messrs. Nevin and Tedeschi alone were entrusted with locating and marshaling Keele's assets. However, when they could not continue their duties, appellant assumed the role of the incapacitated person's de facto guardian. Such an assumption, resulting in the charge of legal fees for services of a nonlegal sort, was, however, precisely what the court sought to avoid when it denied appellant's initial application to be named coguardian, and compensation to her for acting as coguardian, to the extent not barred by the stipulation, was properly denied as unauthorized.

The remaining items in appellant's affidavit of services for the period ending October 20, 1999, setting forth appellant's legal work in pursuance of various fee applications on her own behalf, were not compensable.

Despite Ms. McGrath's admittedly diligent efforts on Ms.

Keele's behalf, the dissent agrees with Justice Lehner that Ms. McGrath's request for a premium fee of $200,000 is unsupported, but feels that it is unfair to cut Ms. McGrath's fee request because the coguardians' statutory fees were increased because of Ms. McGrath's efforts in finding additional assets and because Ms. Keele's estate will probably escheat to the State. However, neither the amount of the coguardians' statutory fees nor the ultimate beneficiary of Ms. Keele's estate should have any bearing on Ms. McGrath's fee. As correctly found by the court, the only legal services for which appellant had not yet been compensated and for which she was entitled to an award were those rendered by her in connection with the final accounting of the coguardians during the period October 20, 1999 through October 30, 2000. Contrary to appellant's contention, no hearing was required prior to the fee award, since the coguardians' final accounting was uncontested and relatively uncomplicated, posing no novel legal issues, and no issue was raised as to appellant's services in connection therewith, or respecting her experience, ability and reputation (*cf. Bankers Fed. Sav. Bank v Off W. Broadway Devs.*, 224 AD2d 376, 378 [1996]; *Kumble v Windsor Plaza Co.*, 128 AD2d 425 [1987], *lv dismissed* 70 NY2d 693 [1987]).

We have considered appellant's remaining contentions and find them unavailing. Concur—Nardelli, J.P., Tom and Andrias, JJ.

Saxe, J., dissents in a memorandum as follows: This appeal concerns a drastically limited award of compensation for an attorney, Diahn W. McGrath, who performed extraordinary services extraordinarily well on behalf of an incapacitated person. Although she was initially retained simply to commence the guardianship proceeding on behalf of the petitioner's fiancée, Ms. McGrath ultimately found it necessary to step into the breach on behalf of her client and his fiancée, and perform tasks which, under ordinary circumstances, would have been handled or overseen by a guardian. The parsimonious counsel fee awarded to this attorney, and now affirmed by this Court, runs contrary to all concepts of fairness. Because I believe that under these unusual circumstances, justice requires that Ms. McGrath be compensated at her usual billing rate for the hours she spent, I dissent.

McGrath was hired by the 87-year-old petitioner, John Nevin, to commence a Mental Hygiene Law article 81 guardianship proceeding on behalf of his 91-year-old fiancée, Judy Keele, who, after a 44-year relationship with him, was suffering from dementia. The court appointed Mr. Nevin as a guardian for

Ms. Keele, but due to Mr. Nevin's recent heart attack, determined that a coguardian would be necessary. Despite Mr. Nevin's request that Ms. McGrath be appointed, the court declined to do so, based upon its unsupported belief that it would be inappropriate to appoint petitioner's attorney as coguardian. Instead, it appointed an attorney unknown to the parties, Thomas Tedeschi, to serve as coguardian.

Nevertheless, it was Ms. McGrath, rather than either of the coguardians, who quickly became the person everyone relied upon to handle the substantial work necessary to fully attend to Ms. Keele's personal and financial interests. Mr. Nevin was admitted to a nursing home following his heart attack; Mr. Tedeschi, while making himself available to Ms. McGrath, agreed with Mr. Nevin that Ms. McGrath should continue to take such actions as were necessary on Ms. Keele's behalf.

Ms. McGrath's efforts were extraordinary, as were the results she obtained. She became the contact person for the facility caring for Ms. Keele, speaking frequently to staff and visiting often. She spent hundreds of hours poring over old papers of Mr. Nevin's and Ms. Keele's that had been designated for the trash, seeking information that might help in locating Ms. Keele's will or any other assets. Indeed, while none of Ms. McGrath's ongoing efforts to locate a will were successful, she did, remarkably, locate a Swiss bank account containing $1,695,000, increasing Ms. Keele's estate from $223,000 to almost $2 million. Ms. McGrath also made a trip to London in late August 1997 to wrap up Ms. Keele's finances there; Mr. Tedeschi had been unable to make the trip at that time, due to other professional obligations. While in London, Ms. McGrath negotiated the termination of Ms. Keele's lease on a London flat, removed Ms. Keele's personal property and arranged for the consignment sale of some items by Christie's, including a Henry Moore sculpture that had been sealed inside a bricked-up fireplace in the flat, which Ms. McGrath recovered, based upon information from Mr. Nevin. The result of Ms. McGrath's London trip was the addition to the estate of over $125,000, derived from the nearly $100,000 realized from the sale by Christie's, the sum of $7,500 paid by a liquidator, $18,600 collected from a London NatWest account, and a refund of National Health premiums in the amount of $2,500.

Mr. Nevin died on May 26, 1998, at which time Mr. Tedeschi became the sole guardian of Ms. Keele; Ms. Keele herself died on October 10, 1998. In the absence of any known heirs, the Public Administrator was named administrator of Ms. Keele's estate.

Even then, Ms. McGrath continued to serve the interests of Ms. Keele's estate, arranging for the necessary fund transfers and working with an accountant to prepare a final accounting. Indeed, it was she who made the funeral arrangements. Ms. McGrath even had to initiate the task of moving to settle the final accounting, despite her suggestion that it was Mr. Tedeschi's responsibility. When, after holding the proposed final accounting for months, court personnel instructed Ms. McGrath to divide the accounting up, with one accounting through the date of Mr. Nevin's death, and the other to the date of Ms. Keele's death, Ms. McGrath obliged them. Finally, with this amended accounting, Mr. Tedeschi filed a new motion to settle the account and to award fees and commissions.

The order settling the account directed payment of full statutory guardians' commissions from the estate of Ms. Keele to Thomas Tedeschi in the amount of $60,196.52 and to John Nevin in the amount of $58,892.27. However, Ms. McGrath's application for legal fees at the rate of $250 per hour for the full number of hours she had worked on behalf of Ms. Keele's interests was largely rejected; instead, she was awarded the additional sum of $5,000 beyond the previous interim awards of fees and disbursements, bringing her total counsel fee award to $36,380. The court also rejected Ms. McGrath's request for a "premium" fee, based upon the extraordinary benefit conferred upon the estate by her efforts; the court termed this request "an attempt to grossly overreach."

Review of the foregoing makes it apparent why Ms. McGrath felt justified in seeking an award of "premium" legal fees. It was she who performed the lion's share of the work of locating and wrapping up Ms. Keele's estate; yet everyone *except her* profited remarkably from her work. No one questioned the co-guardians' right to statutory compensation of close to $60,000 each, calculated at a percentage of Ms. Keele's total estate, despite the extremely limited nature of their efforts; even the Public Administrator would receive a similar amount as her statutory commission calculated from the remainder of the estate of approximately $2 million. In contrast, Ms. McGrath's hourly rate of $250 was challenged, and most of the hours she had worked on behalf of Ms. Keele's financial interests were ignored. Of her additional fee accrual since the prior fee award, a total of $33,825 plus $830.95 disbursements for approximately 155 hours of her time spent in connection with Ms. Keele's estate, Ms. McGrath was awarded a total of $5,000; her request for an additional fee award for prior work for which

she was not compensated in the prior orders was rejected outright.*

The statutory scheme of Mental Hygiene Law article 81 provides that guardians' compensation be calculated as a percentage of the estate of the incapacitated person (Mental Hygiene Law § 81.28); those whom they hire to assist them must have their fees approved by the court, as the order appointing the coguardians in this case provided. Most of the time, the estates of incapacitated persons are not large, and the courts handling guardianship matters are justifiably vigilant against impoverishing an incapacitated person by the process of appointing and maintaining the guardianship. The average guardianship estate is far smaller than the $2 million estate here; after payment of court evaluators, guardians ad litem, and professionals such as lawyers and accountants, guardian commissions can quickly eat up the remaining estate of an incapacitated person.

In this unusual case, though, the estate is quite substantial, and, indeed, its size is directly due to the extraordinary efforts of Ms. McGrath. Furthermore, there are no known heirs, and it appears likely that the remaining funds will escheat to the State. In such circumstances, it is a substantial injustice to fail to fully compensate Ms. McGrath at her usual rate for all the hours she worked, when she was the one person who actually, with dedication, performed the work necessary on behalf of the incapacitated person. Furthermore, not only was Ms. McGrath not fully compensated, but, although she was the one person who actually performed the actual work of the estate, she received almost 50% less compensation than those who did virtually nothing.

While Ms. McGrath's request that she be awarded a "pre-

---

* The amounts she received were as follows:

|  | Requested | Awarded | Disallowed |
| --- | --- | --- | --- |
| 4/2/97-5/15/97 (pre-hearing period) | $11,275 + 280 | $4,780 | $ 6,775 |
| 5/15/97-2/18/98 | $25,872.50 + 5,533.77 | 26,600 (by stip) | $ 4,806.27 |
| 2/18/98-10/20/99 | $19,967.50 + 232.35 | $5,000 | $15,199.85 |
| 10/20/99-10/30/00 | $13,857.50 + 598.60 | -0- | $14,456.10 |
| 1997 London travel time | $ 2,000 | -0- | $ 2,000 |

mium" for her successful efforts on behalf of the estate is understandable, there is no basis in the law for doing so where an attorney receives an hourly rate of pay. The cases she relies on are inapposite. *Matter of Khoubesserian* (264 AD2d 599 [1999], *lv denied* 94 NY2d 757 [1999]) merely upheld an agreed-upon one-third contingency fee; in *Matter of Taylor* (206 Misc 69 [1954]), a quantum meruit award was made *because there was no agreed-upon basis for awarding attorney's fees*. Finally, *Matter of Freeman* (34 NY2d 1 [1974]), which sets out the factors to consider in awarding fees for services rendered to fiduciaries, does not support payment *beyond* the amount due for the full number of hours where the person was retained at an agreed-upon hourly rate.

Although I agree with the Supreme Court that an award of a premium fee is unsupported, the motion court's characterization of Ms. McGrath's application as gross overreaching was uncalled for. Such a characterization of a lawyer by a judge can cause substantial harm to a lawyer's career. It is particularly unfair here in light of her extraordinary efforts, which, notwithstanding the implications of the Public Administrator, were of a dedicated rather than a calculating nature.

The Supreme Court has broad discretion in awarding attorneys' fees in guardianship proceedings. However, this Court has the authority to revisit such an attorneys' fee award when it finds the Supreme Court failed to appropriately consider and weigh the applicable factors, as enumerated in *Matter of Freeman* (*see Matter of Mavis L.*, 285 AD2d 509 [2001]). In *Matter of Mavis L.* the Second Department increased a fee award, explaining that "[a]bsent the appellant's experienced service, the estate would have been minimal" and that "the results obtained by the appellant were remarkable considering the circumstances" (*id.* at 510).

The same considerations observed in *Matter of Mavis L.* are at work here, and under these circumstances, our authority to increase a counsel fee award ought to be exercised. Ms. McGrath is entitled to be fully compensated for the hours she actually spent on behalf of Ms. Keele's interests, and the compensation should be at her full $250 hourly rate.

There is no claim here that Ms. McGrath's very complete time records are inaccurate in any way. Nor is there any claim that the work she performed was unnecessary. Indeed, her diligence was acknowledged by all.

As to the suggestion that a nonlawyer could have done the tasks performed by Ms. McGrath, so that the hourly rate for the work she claimed should be reduced from $250, I do not

agree that this argument warrants any reduction in these circumstances. Review of the various types of tasks undertaken by Ms. McGrath in London make it apparent that while others could possibly have been hired, at a cheaper rate, for particular portions of the work, the tremendous success of the enterprise could only have been accomplished with Ms. McGrath or someone of equal knowledge and dedication organizing, overseeing and assigning those tasks. It is questionable whether any savings would have been realized by the estate if this type of fee-saving had been attempted.

Indeed, Ms. McGrath explains that her familiarity with elder law and trusts and estates work proved to be very useful to much of the work she performed in London on behalf of Ms. Keele, as were her knowledge of antiques and couture and her prior experience with auction houses. While not all of these skills require a law degree, the nonlegal aspects would themselves have commanded a premium rate of pay. Moreover, while it is possible that some of the work could have been performed by a nonlawyer at a cheaper rate, it is clear that Ms. McGrath's undisputed success in London was due to a degree of dedication and diligence that no one would expect to receive from a disinterested employee.

It seems unlikely that Ms. Keele's assets would have been so successfully marshaled if handled in a more typical, expeditious way. For instance, anyone could have arranged for a liquidator to remove Ms. Keele's personal property from the apartment; but few besides Ms. McGrath could have first winnowed out the more valuable "couture" items that could be auctioned through Christie's. I wonder how many would have bothered to talk to Mr. Nevin in sufficient depth to obtain information regarding the hidden Henry Moore sculpture and actually unearthed the sculpture from the bricked-up fireplace.

Finally, the standard rule that we will not compensate attorneys for time spent in the fee application itself should not be used to preclude compensation for the many hours Ms. McGrath was forced to spend in putting together the final accounting, in the form required upon review by court personnel, particularly when she was compelled to take charge of the task because the coguardian had failed to take responsibility for seeing to it.

Accordingly, I would modify the order on appeal so as to increase the fee award from $5,000 to $35,825 plus $830.95 for disbursements.