OPINION OF THE COURT
Renee R. Roth, S.
Three of four petitions now before the court raise yet another of the troubling legal questions that were left in the wake of the terrorist attacks on the World Trade Center on September 11, 2001. Petitioners seek permission to collect and distribute awards from the September 11th Victim Compensation Fund of 2001 to the respective survivors of four different 9/11 victims. Incident to all but one of such applications, the court is asked to approve the contingency fees of the lawyers who presented the claims upon which such awards were based. The novel issue posed by such request is the appropriateness of contingency fees in these cases which have no resemblance to the usual tort action for which contingency fees were designed.
The instant petitions arise from the same central circumstance — i.e., the decedent’s fatal connection to one of the Twin Towers.
The estate of Jose Gomez involves an award of $1.3 million to decedent’s wife and three minor children. There is no issue concerning legal fees since the law firm that obtained such award did so pro bono.
Of the three other petitions, the legal fee in the estate of Paul E. Jeffers ($53,500) is the most modest although the award to decedent’s minor child ($5.35 million) was the largest. As these figures suggest, counsel’s retainer provided for a fee based on one percent of the total award.
Another of these petitions involves an award of $1.84 million to the wife of Karamo Trerra. The legal fee under the retainer is $184,000, i.e., 10% of the total award.
Finally, the petition in the estate of Douglas Jason Irgang involves a total award of $4,467,000 to be shared among decedent’s mother, brother and domestic partner. The legal fee, under a retainer setting such fee at eight percent of the award for economic loss, is $322,000.
*536 A review of the legislative and administrative background of the Fund is necessary to understand the present issue. The Fund was established by Congress under the Air Transportation Safety and System Stabilization Act of 2001 (ATSSSA) (Pub L 107-42, 115 US Stat 230 [2001]), within days of the terrorist-caused airplane crashes in New York, Washington, D.C. and Pennsylvania. Such legislation attempted to assure redress for the 9/11 victims and their families to the extent practicable while also protecting the public’s interest in preserving a viable aviation industry in this country. On the one hand, therefore, the Fund was designed to afford a speedy and adequate response to the financial needs of victims and their survivors. On the other hand, it was also intended to avoid potentially bankrupting lawsuits against the airlines and their satellite industries by offering the victims or their surviving dependents a satisfactory alternative to conventional litigation (see 147 Cong Rec H5684-90 [Sept. 14, 2001]).
To induce claimants to look to the Fund rather than tort litigation as a source of compensation, Congress made liability absolute and therefore not an issue for purposes of recovery from the Fund (ATSSSA § 405 [b] [2]). For those eligible to recover from the Fund, the amount of the award was in essence a function of only two basic factors: economic loss and noneconomic loss (net of payments from other sources, e.g., insurance), without regard to fault. A two-option methodology for determining the amount of such awards was established under regulations promulgated by the Attorney General of the United States (28 CFR 104.1 et seq.) and refined in procedural and substantive rules issued by a special master appointed by him to administer the Fund (28 CFR 104.43). Under one option, claimants could seek an award for loss based upon standard tables compiled by the special master, with the size of the recovery calculated in accordance with such variables as the victim’s age, income and employment benefit levels, and family status (28 CFR 104.31 [b] [1]). Under the other option, claimants could seek a hearing to prove “extraordinary circumstances” which warranted a higher recovery in their cases than would have been allowable through the standard calculation (28 CFR 104.31 [b] [2]). In all cases, however, additional compensation was prescribed for what was called “non-economic loss” at an unvariable amount of $250,000 per victim and $100,000 for each dependent (28 CFR 104.44).
As one commentator has observed,
*537 “[T]he Special Master . . . crafted a regulatory framework that rejected] the uniqueness of each individual injured or killed in the attacks and opt[ed] instead for commonality of compensation and ease of administration . . .
“[Accordingly, claimants were able to] receive substantial amounts of compensation for non-economic losses quickly, inexpensively, and without regard to fault . . . [and t]he use of common economic analyses and published charts [assisted] . . . claimants [to] predetermine [ ] their recoverable [economic] losses” (Campbell, The September 11th Attack on America: Ground Zero in Tort and Insurance Law, 9 Conn Ins LJ 51, 76, 93).
In other words, as the special master noted in the preamble and statement accompanying his Final Rule,
“The Fund provide [d] an alternative to the significant risk, expense, and delay inherent in civil litigation by offering victims and their families an opportunity to receive swift, inexpensive, and predictable resolution of claims . . .
“[WJhen compared to the alternative of a protracted, uncertain lawsuit . . . the Fund [may be deemed to have] provide [d] a vastly preferable method ...” (67 Fed Reg 11,233 [Mar. 13, 2002]).
Although such observations were made in terms of the interests of the claimants themselves, they are no less applicable to the lawyers who represented the claimants before the Fund. The mechanism for seeking awards from the Fund afforded counsel as well as client the advantages of a relatively simple and nonadversarial process and a relatively predictable outcome. Accordingly, counsel who appeared before the Fund representing, as in each of these cases, one or more indisputably eligible claimants did not bear the risks that ordinarily justify contingency fees in conventional tort litigation (see Gair v Peck, 6 NY2d 97, 103 [1959]). Simply put, for the lawyers involved in such a process, there was no contingency upon which to support a contingency-type of fee.
There are, however, two considerations that might suggest that the fees in these cases should be accepted at face value.
First, it is noted that the various percentage factors in the present retainers are well below the percentages typical to contingency-fee arrangements. Such retainers thus appear to acknowledge (at least between the lines) that counsel’s *538 undertaking was to be different in degree, if not in kind, from what it would have been if the fee arrangement had contemplated the prosecution of a tort action. Nevertheless, even low percentages do not necessarily avoid the problem with a percentage-of-recovery formula where a large recovery is virtually assured: the possibility for a substantial disproportion between the resultant fee and the value of the services rendered.
Second, it is further noted that none of the interested parties in any of these cases has objected to the fees as sought. Indeed, the claimants in the Trerra and Irgang matters either were party to the retainers as fiduciaries or signed consents to the fees for purposes of this proceeding. Nonetheless, as the Court of Appeals has made clear, lack of opposition on an accounting cannot deter the court from inquiring into the reasonableness of a fee that is questionable on its face, “even though [such fees have been] agreed upon by the [fiduciary] and assented to by the beneficiaries” (Stortecky v Mazzone, 85 NY2d 518, 526 [1995]; see also Matter of Cook, 41 AD2d 907, 907 [1973] [“The court has the power and the obligation to limit the compensation of attorneys to reasonable amounts regardless of any agreement made by the fiduciary”]). The minor child in Jeffers, of course, is not bound by the terms of the retainer signed by his uncle as fiduciary (Matter of Muccini, 118 Misc 2d 38, 41 [1983]).
For the reasons outlined in Stortecky (id.), this court is mindful that a sua sponte probe into the reasonableness of legal fees to which all interested parties have consented should be sparingly undertaken. The court is also mindful of the possibility that, upon further inquiry, in one or more of these cases the fee set by the retainer may ultimately be shown to be no more than what is “reasonable” as measured under Matter of Freeman (34 NY2d 1 [1974]), Matter of Potts (213 App Div 59 [1925]) and their progeny. The present records, however, do not supply a basis upon which to make such a comparison. They do not disclose the efforts made, the time spent, whether the awards were in the predetermined standard amounts or whether higher awards were achieved after hearings or submissions of substantial documentary support before the Fund. Accordingly, counsel in the estates of Irgang, Jeffers and Trerra are directed to file an affidavit of legal services within three weeks of the date of this decision. Such affidavit should include all relevant facts including whether there was a hearing to establish “extraordinary circumstances” and whether and to what degree the award exceeded the standard amount.